ROGERS, J., delivered the opinion of the court, in which NELSON, J., joined.
MARTIN, J. (pp. 380-92), delivered a separate opinion concurring in part and dissenting in part.
OPINION
ROGERS, Circuit Judge.
In this case we are required to decide the constitutionality of Tennessee’s statute making available the purchase of automobile license plates with a “Choose Life” *372 inscription, but not making available the purchase of automobile license plates with a “pro-choice” or pro-abortion rights message. See TENN. CODE ANN. § 55-4-306. Although this exercise of government one-sidedness with respect to a very contentious political issue may be ill-advised, we are unable to conclude that the Tennessee statute contravenes the First Amendment. Government can express public policy views by enlisting private volunteers to disseminate its message, and there is no principle under which the First Amendment can be read to prohibit government from doing so because the views are particularly controversial or politically divisive. We accordingly reverse the judgment of the district court invalidating the statute on First Amendment grounds.
I.
Tennessee statutory law authorizes the sale of premium-priced license plates bearing special logotypes to raise revenue for specific “departments, agencies, charities, programs and other activities impacting Tennessee.” TENN. CODE ANN. § 55-4-201(j). The statute authorizing issuance of these license plates earmarks half of their respective profits for named nonprofit groups committed to advancing the causes publicized on the plates. Id. § 55-4-215 to -217.
The State of Tennessee takes the other half of the profits. See id. § 55-4-215(a)(2)-(3). Forty percent (of the total profits) goes to the Tennessee arts commission, while the remaining 10 percent goes to the state’s highway fund. Id. Tennessee will not issue a new specialty license plate until customers place at least one thousand advance orders. See id. §. 55-4-201(h)(l).
The Tennessee legislature has determined the price of specialty plates by statute. In general, they cost the same as a non-specialty plate plus a $35.00 fee (if the government issues the plate on or after September 1, 2002, as in this case). See id. § 55-4-203(d).
In 2003, the Tennessee legislature passed a law (hereinafter “the Act”) authorizing issuance of a specialty license plate with a “Choose Life” logotype “designed in consultation with a representative of New Life Resources.” See id. § 55-4-306(b). Half of the profits go to New Life Resources, Inc. (New Life). See id. § 55-4-306(c)-(d). New Life’s half “shall be used exclusively for counseling and financial assistance, including food, clothing, and medical assistance for pregnant women in Tennessee.” Id. § 55-4-306(c). The Act strictly regulates the precise activities that these profits shall fund. See id. § 55-4-306(d). It also provides a comprehensive list of dozens of groups that must share in a portion of these profits. See id. It is undisputed that during legislative consideration of the Act, Planned Parenthood of Middle and East Tennessee “lobbied for an amendment authorizing a ‘Pro-Choice’ specialty license plate ..., but the measure was defeated.” JA 231.
The plaintiffs in this action, the American Civil Liberties Union of Tennessee and others, filed a civil action in federal district court challenging the Act as facially unconstitutional, naming the Governor of Tennessee as defendant. New Life intervened as a defendant. The district court granted summary judgment to the plaintiffs, enjoining enforcement of the Act. The district court held that the authorization of the “Choose Life” license plate was not purely government speech. Relying largely upon Fourth Circuit precedent, the district court held that “both the State and the individual vehicle owner are speaking” — a “mixture” of government and private speech. JA 33-34 (citing Planned Parenthood of S.C., Inc. v. Rose, 361 F.3d *373 786, 793-94 (4th Cir.2004); Sons of Confederate Veterans, Inc. v. Comm’r of the Va. Dep’t of Motor Vehicles, 288 F.3d 610, 615 (4th Cir.2002)). Reasoning that providing for such “mixed” speech is not constitutional if doing so is discriminatory as to viewpoint, the district court found that the statute was clearly discriminatory as to viewpoint and enjoined enforcement of the Act. The district court expressly refrained, however, from reaching the question of whether the entire specialty license plate program was unconstitutional.
New Life appeals. Although the Tennessee state defendants have not appealed, they have filed a brief urging this court not to strike down Tennessee’s specialty license plate- scheme in its entirety.
II.
First, the district court was not deprived of subject matter jurisdiction in this case by the Tax Injunction Act (TIA), 28 U.S.C. § 1341, as argued by New Life. New Life claims that the extra cost for a “Choose Life” specialty license plate constitutes a tax that may not, under the TIA, be enjoined by a federal district court if a plain, speedy and efficient remedy may be had in Tennessee courts. Even making the somewhat artificial assumption that it is really the payments that are being challenged in this case,[1] the payments are most closely analogous to payments for simple purchases from the government. Ordinary purchase payments are not taxes under the TIA, and neither is the extra payment for a specialty license plate. It follows that the TIA did not deprive the district court of subject matter jurisdiction in. this case.
This conclusion is supported by the longstanding distinction drawn in various legal contexts between taxes and ordinary debts. The Supreme Court for instance explained in New Jersey v. Anderson, 203 U.S. 483, 492, 27 S.Ct. 137, 51 L.Ed. 284 (1906):
Generally speaking, a tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government. We think this exaction is of that character. It is required to be paid by the corporation after organization in invitum.[2] The amount is fixed by the statute, to be paid on the outstanding capital stock of the corporation each year, and capable of being enforced by action against the will of the taxpayer. As was said by Mr. Justice Field, speaking for the court in Meriwether v. Garrett, 102 U.S. 472, 513, 26 L.Ed. 197:
“Taxes are not debts.... Debts are obligations for the payment of money founded upon contract, express or implied. Taxes are imposts levied for *374 the support of the Government, or for some special purpose authorized by it. The consent of the taxpayer is not necessary to their enforcement. They operate in invitum. Nor is their nature affected by the fact that in some States — and we believe in Tennessee — an action of debt may be instituted for their recovery. The form of procedure cannot change their character.”
See also Fla. Cent. & Peninsular R.R. Co. v. Reynolds, 183 U.S. 471, 475, 22 S.Ct. 176, 46 L.Ed. 283 (1902) (“tax” defined as “enforced” contribution and distinguished from ordinary contractual debt); Patton v. Brady, 184 U.S. 608, 619, 22 S.Ct. 493, 46 L.Ed. 713 (1902) (same); Alaska Consol. Canneries v. Territory of Alaska, 16 F.2d 256, 257 (9th Cir.1926) (same).
The Fifth Circuit has relied upon the definition of tax in Anderson to hold that a challenge to the collection of lease rent payments was not subject to the Tax Injunction Act. The Fifth Circuit explained,
The State contends that the leases are in fact taxes, and thus the federal courts are barred by the Tax Injunction Act, 28 U.S.C. § 1341, from entertaining a challenge to the State’s actions to collect on the leases. This contention is without merit. The lease obligations are a creature of contract, not a mandatory obligation imposed by the state as taxes are.
Lipscomb v. Columbus Mun. Separate Sch. List., 269 F.3d 494, 500 n. 13 (5th Cir.2001). The analysis would apply a for-tiori to ordinary purchases, like the purchase of government bonds, or the purchase of a souvenir at a state park gift store. Such purchase payments can hardly be termed “taxes” as opposed to ordinary payments on voluntary contracts. This conclusion follows, moreover, regardless of what the government does with the sales income.
In this case, Tennessee’s sale of specialty plates creates contractual debts to pay but imposes no tax. Instead of using its sovereign power to coerce sales, Tennessee induces willing purchases as would any ordinary market participant. The government confers all the same driving privileges on people who forgo specialty plates to buy standard-issue plates. Drivers’ only motive for buying such plates, therefore, must rest with the attractiveness of the “Choose Life” message as Tennessee has marketed it, not a desire to obey Tennessee’s will. Under Anderson and Lipscomb, these sales constitute regular contractual payments, not taxes.
We recognize that there is some case law to the effect that cases like this one are precluded by the Tax Injunction Act. See Henderson v. Stalder, 407 F.3d 351, 354-60 (5th Cir.2005); NARAL Pro-Choice Ohio v. Taft, No. 1:05 CV 1064, 2005 U.S. Dist. LEXIS 21394, at *16-*26 (N.D.Ohio Sept. 27, 2005). These cases proceed on the questionable assumption that the applicable test is the one for differentiating between a regulatory fee and a tax. See generally Hedgepeth v. Tenn., 215 F.3d 608 (6th Cir.2000). This test was created to answer a different question: whether a regulatory fee, often directed to a segregated fund for a special use related to the basis for imposing the fee, is or is not a tax for. TIA purposes. See generally San Juan Cellular Tel. Co. v. Pub. Serv. Comm’n of P.R., 967 F.2d 683 (1st Cir.1992). The classic non-tax regulatory fee
is imposed by an agency upon those subject to its regulation. It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray *375 the agency’s regulation-related expenses.
Id. at 685 (citations omitted) (Breyer, J.). In contrast, a purchase price cannot be said to be “imposed by an agency upon those subject to its regulation.” Instead it is merely a contract price. The test for determining which compelled exactions are taxes and which are fees cannot logically be used to determine whether a payment is a compelled exaction in the first place. Under the Supreme Court’s basic definition of a tax, logically applied in Lipscomb, the TIA does not preclude federal jurisdiction over the plaintiffs’ claims in this case.
Eight judges of the Fifth Circuit accordingly dissented from the denial of rehearing en banc in Henderson v. Stalder, 434 F.3d 352 (5th Cir.2005) (Davis, J. dissenting). In an opinion with which we are in substantial agreement, the dissent acknowledged the accepted test for distinguishing between a regulatory fee and a tax, but explained that “this does not mean that the extra charge for a specialty plate must be one or the other.” Id. at 355. It does not follow, in other words, that if “the charge is not a regulatory fee ... it must be a tax.” Id. Relying in part on the Ninth Circuit’s reasoning in Bidart Brothers v. Calif. Apple Comm’n, 73 F.3d 925 (9th Cir.1996), the Fifth Circuit dissent reasoned that, “the relevant question is whether this charge is a tax and if the answer to this question is no, the TIA does not apply regardless of whether the charge is characterized as a regulatory fee, a charitable donation or something else.” Henderson, 434 F.3d at 355. Thus even though the Fifth Circuit dissent found the charge for the Louisiana “Choose Life” plate not to be a regulatory fee, the charge was not a tax either, in part because “the charge is not ‘imposed’ by the legislature; because it is entirely optional and voluntary on the part of Louisiana citizens electing to pay the extra charge for a specialty plate.” Id. at 356.
III.
On the merits we are faced with a purely legal issue: whether a government-crafted message disseminated by private volunteers creates a “forum” for speech that must be viewpoint neutral. No such requirement applies, at least with respect to state-produced specialty license plates like those at issue in this case.

A. The “Choose Life” Specialty License Plate Bears a Government-Crafted Message

“Choose Life,” as it is to appear on the face of Tennessee specialty license plates, is a government-crafted message. See Johanns v. Livestock Mktg. Ass’n, 544 U.S. 550, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005). Johanns stands for the proposition that when the government determines an overarching message and retains power to approve every word disseminated at its behest, the message must be attributed to the government for First Amendment purposes. See id. at 2062-66. In this case, Johanns requires the court to conclude that “Choose Life” is Tennessee’s message because the Act determines the overarching message and Tennessee approves every word on such plates.
In Johanns, the Supreme Court held that federal government promotional campaigns to encourage beef consumption constituted government speech because the “message of the promotional campaigns is effectively controlled by the Federal Government itself.” Id. at 2062. In these campaigns, however, the federal government did not explicitly credit itself as the speaker. See id. at 2059 (messages bore the attribution, “Funded by America’s Beef Producers”).
*376 More specifically, the “message set out in the beef promotions” counted as government speech because “from beginning to end [it is] the message established by the Federal Government.” Id. at 2062. Congress “directed the implementation of a coordinated program of promotion” that includes paid advertising to advance the “image and desirability of beef and beef products.” Id. at 2062-63 (internal quotation marks omitted). Congress and the U.S. Secretary of Agriculture enunciated “the overarching message and some of its elements,” while leaving the “remaining details to an entity whose members are answerable to the Secretary.” Id. at 2063. Also, the “Secretary exercises final approval authority over every word used in every promotional campaign.” Id. The Supreme Court concluded that when “the government sets the overall message to be communicated and approves every word that is disseminated,” it is government speech. Id.
Johanns supports classifying “Choose Life” on specialty license plates as the State’s own message. The Tennessee legislature chose the “Choose Life” plate’s overarching message and approved every word to be. disseminated. Tennessee set the overall message and the specific message when it spelled out in the statute that these plates would bear the words “Choose Life.” TENN. CODE ANN. § 55-4-306. Tennessee, like the Secretary of Agriculture in Johanns, leaves some of the “remaining details to an entity whose members are answerable” to the State government. Tennessee delegates partial responsibility for the design of the plate to New Life, but retains a veto over its design. See id. § 55 — 4—306(b). The “Choose Life” plate must be issued in a design configuration distinctive to its category and determined by the commissioner. Id. § 55-4-202(b)(2). Thus, Tennessee’s statutory law, and its power to withdraw authorization for any license plate, gives the State the right to wield “final approval authority over every word used” on the “Choose Life” plate. As in Johanns, here Tennessee “sets the overall message to be communicated and approves every word that is disseminated” on the “Choose Life” plate. It is Tennessee’s own message.
Plaintiffs argue that “Choose Life” on specialty plates should be treated not as Tennessee’s own message but as “mixed” speech subject to a viewpoint-neutrality requirement. Plaintiffs point to the following undisputed facts to support their view: (1) Tennessee produces over one hundred specialty plates in support of diverse groups, ideologies, activities, and colleges; (2) a private anti-abortion group, New Life, collaborates with the State to produce the “Choose Life” plate; and (3) vehicles are associated with their owners, creating the impression that a “Choose Life” license plate attached to a vehicle represents the vehicle owner’s viewpoint. These facts' are however consistent with the determination that “Choose Life” on a Tennessee specialty plate is a government-crafted message.
First, there is nothing implausible about the notion that Tennessee would use its license plate program to convey messages regarding over one hundred groups, ideologies, activities, and colleges. Government in this age is large and involved in practically every aspect of life. At least where Tennessee does not blatantly contradict itself in the messages it sends by approving such plates, there is no reason to doubt that a group’s ability to secure a specialty plate amounts to state approval. It is noteworthy that Tennessee has produced plates for respectable institutions such as Penn State University but has issued no plates for groups of wide disrepute such as the Ku Klux Klan or the American Nazi Party. Plaintiffs’ position implies that Tennessee must provide specialty plates *377 for these hate groups in order for it constitutionally to provide specialty plates supporting any institution. Such an argument falls of its own weight.
Second, as Johanns makes clear, the participation of New Life in designing the “Choose Life” logotype has little or no relevance to whether a plate expresses a government message. See 125 S.Ct. at 2062-63. In Johanns the Supreme Court upheld the beef marketing scheme as government speech even though the development of details was left to an entity “answerable” to the Secretary of Agriculture, Id. So long as Tennessee sets the overall message and approves its details, the message must be attributed to Tennessee for First Amendment purposes. See id.
Third, Johanns also says that a government-crafted message is government speech even if the government does not explicitly credit itself as the speaker. Many of the promotional messages in Jo-hanns bore the attribution “Funded by America’s Beef Producers.” Id. at 2059. The Supreme Court explained that the tagline, “standing alone, is not sufficiently specific to convince a reasonable factfinder that any particular beef producer, or all beef producers, would be tarred with the content of each trademarked ad.” Id. at 2065-66. This was true even though the message was presumably conveyed in private media containing mostly privately-sponsored advertising. In contrast, the medium in this case, a government-issued license plate that every reasonable person knows to be government-issued, a fortiori conveys a government message.

B. Dissemination of a Government-Crafted Message by Private Volunteers Does Not Create a “Forum” for Speech Requiring Vieivpoint Neutrality

Plaintiffs’ most intuitively inviting argument — that the government must be viewpoint neutral when it relies on like-minded volunteers to disseminate its message — cannot in the end invalidate the Act. Plaintiffs point to the following facts to support this aspect of their argument: (a) the government must receive one thousand advance customer orders for the “Choose Life” plate or Tennessee will not manufacture it; (b) the “Choose Life” message is communicated by private citizens’ affirmatively purchasing the plates and attaching them to their privately-owned vehicles; (c) the Tennessee government devotes no funds to disseminating the “Choose Life” message, but rather raises money by selling these plates to customers who wish to have “Choose Life” plates on their cars. While it is true that such voluntary dissemination itself qualifies as expressive conduct, the government’s reliance on private volunteers to express its policies does not create a “forum” for speech requiring viewpoint neutrality.
This conclusion is supported by negative inference from the one Supreme Court case dealing with license plate speech. In Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), New Hampshire embossed its state motto, “Live Free or Die,” on standard-issue license plates in the same way that Tennessee would stamp “Choose Life” on specialty plates. See id. at 707, 97 S.Ct. 1428. The Wooley Court characterized “Live Free or Die” as “the State’s ideological message,” id. at 715, 97 S.Ct. 1428, and the State’s “official view,” id. at 717, 97 S.Ct. 1428. The Supreme Court held that New Hampshire could not constitutionally prosecute vehicle owners for covering up the motto on their license plates, because by doing so the State would be unconstitutionally forcing automobile owners to adhere to an ideological point of view they disagreed with. Nowhere did the Court suggest that the *378 State’s message could not be so disseminated by those who did not object to the State’s motto, or even hint that the State could not put the message on state-issued license plates. “Choose Life” is Tennessee’s public message, just as “Live Free or Die” communicated New Hampshire’s individualist values and state pride. The evil in Wooley was that the automobile owners were compelled to disseminate the message; here automobile owners are not only not compelled, they have to pay extra to disseminate the message.
In general, the government does not create a “forum” for expression when it seeks to have private entities disseminate its message. In Johanns, for instance, the federal government paid for the “Beef. It’s What’s for Dinner” message and other promotional messages. 125 S.Ct. at 2059. Although these involved “print and television messages,” id. at 2059, presumably published or broadcasted by hired private entities, the Court classified this and the rest of the beef promotions as government speech for First Amendment purposes. See id. at 2058, 2062-66. Likewise, in Rust v. Sullivan, the federal government allocated Title X funds to doctors for family planning counseling but forbade such doctors from discussing abortion with the program’s patients. 500 U.S. 173, 178-83, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). In Rust, the Court recognized that when “the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee.” Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (interpreting Rust). If in this case Tennessee drivers were paid by the government to display “Choose Life” plates, the Act would unquestionably be constitutional.
In this case, however, the carriers of Tennessee’s message are unpaid. They are volunteers. Rather then receiving government money, they pay out of their own pockets for the privilege of putting the government-crafted message on their private property. Plaintiffs argue that this fact demonstrates that “Choose Life” is not purely the government’s message but also the speech of the customers who purchase and display these plates — thus creating a “forum” for speech. While it is true that volunteers’ display of “Choose Life” plates expresses agreement with Tennessee, that fact does not mean that a First Amendment “forum” for speech has been created.
The doctors in Rust disagreed with the government’s anti-abortion policy. But if they had been true believers in the policy and had volunteered to work in the program free of charge, the speech restrictions in Rust would still have expressed the government’s anti-abortion viewpoint — and therefore qualified for government speech treatment. Similarly, the publications and television stations in Jo-hanns that published or broadcasted beef advertisements would have conveyed a government-crafted message even if they had done so for free. There is nothing in the Supreme Court’s decisions in Rust or Johanns that implies that the government has less right to control expressions of its policies when it relies on unpaid private people. No constitutionally significant distinction exists between volunteer dissemi-nators and paid disseminators.
Plaintiffs’ view that volunteer dissemination of a government-crafted message creates a “forum,” if accepted, would force the government to produce messages that fight against its policies, or render unconstitutional a large swath of government *379 actions that nearly everyone would consider desirable and legitimate. Government can certainly speak out on public issues supported by a broad consensus, even though individuals have a First Amendment right not to express agreement. For instance, government can distribute pins that say “Register and Vote,” issue postage stamps during World War II that say “Win the War,”[3] and sell license plates that say “Spay or Neuter your Pets.”[4] Citizens clearly have the First Amendment right to oppose such widely-accepted views, but that right cannot conceivably require the government to distribute “Don’t Vote” pins, to issue postage stamps in 1942 that say “Stop the War,” or to sell license plates that say “Spaying or Neutering your Pet is Cruel.”
We cannot affirm the district court in this case without either (1) effectively invalidating all such hitherto-accepted forms of privately disseminated government speech, or (2) distinguishing these examples from the “Choose Life” specialty license plates.
Neither the district court nor the plaintiffs on appeal attempt to articulate a basis for distinguishing these examples. Government-printed pamphlets or pins saying “Register and Vote” or “Buy U.S. Bonds” are clearly government-crafted messages distributed by private individuals who have a First Amendment right not to disseminate them if they don’t want to. Postage stamps saying ‘Win the War” or “Support Our Troops” are clearly government-crafted messages disseminated by private individuals who, under Wooley, also presumably have a First Amendment not to buy or use them if they don’t want to. And license plates saying for instance “Spay or Neuter your Pets” are even more obviously indistinguishable from the license plates at issue in this case. Indeed, the State of Tennessee in this appeal, not advocating reversal of the district court’s injunction but urging us not to invalidate the entire specialty license plate program, offers no tenable basis for drawing a distinction between the dozens of government messages available on Tennessee plates and the “Choose Life” message.
Of course the unstated distinction is that the “Choose Life” message is highly controversial. With respect to the “Choose Life” message, much more than in the above examples, there are large numbers of participants in the public discourse with an opposing view. Such a distinction, however, is entirely indefensible as a matter of First Amendment law, however much it might properly motivate the Tennessee legislature as a matter of policy. Such a distinction would fly in the face of the fundamental free speech principle that views expressed by substantial numbers are treated no differently by the First Amendment than extreme or way-out-of-the-mainstream views. Government *380 speech disseminated by private volunteers, in other words, cannot have its constitutionality under the First Amendment depend on the small number of objectors to the government’s message, or the extreme nature of their views.
In the absence of a tenable distinction, invalidating the Act in this case would effectively invalidate not only all those government specialty license plate provisions that involve a message that anyone might disagree with, but also effectively invalidate all manner of other long-accepted practices in the form of government-crafted messages disseminated by private volunteers. We are not provided with a sound legal basis for making such a leap.
We recognize that the Fourth Circuit has invalidated a nearly identical specialty license plate law in South Carolina. See Planned Parenthood of S. C., Inc., v. Rose, 361 F.3d 786 (4th Cir.2004). In Rose Judge Michael enunciated a rationale that neither of the other two panel judges joined, although both concurred in the judgment. See id. at 800 (Luttig, J., concurring in the judgment); id. at 801 (Gregory, J., concurring in the judgment). The reasoning of the Fourth Circuit judges is not persuasive, primarily for two reasons.
First, the Fourth Circuit opinions in Rose are in tension with the intervening case of Johanns. Johanns sets forth an authoritative test for determining when speech may be attributed to the government for First Amendment purposes. Rose relied instead on a pre-Johanns four-factor test of the Fourth Circuit’s own devising that led to an “indeterminate result” on the crucial issue of whether “Choose Life” specialty plates express a government message. Id. at 793. The Johanns standard, by contrast, classifies the “Choose Life” message as government speech.
Second, none of the separate Fourth Circuit opinions explains how that court would treat such unexceptional examples of government-provided, privately disseminated speech as those described above. Without an articulated basis for distinguishing such examples, following the Fourth Circuit’s lead in this case would invalidate wide swaths of previously accepted exercises of government speech. With no Supreme Court case requiring us to take such a step, we decline to do so.
IY.
For the foregoing reasons, the district court’s order enjoining enforcement of the Act is REVERSED and REMANDED for proceedings consistent with this opinion.

. Compare Hibbs v. Winn, 542 U.S. 88, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004). In Hibbs, the Supreme Court held that the TIA did not bar an Establishment Clause challenge to a state income-tax credit for payments to certain organizations that give tuition grants to students attending religious schools. The Court explained that “in enacting the TIA, Congress trained its attention on taxpayers who sought to avoid paying their tax bill by pursuing a challenge route other than the one specified by the taxing authori.ty.” Hibbs, 542 U.S. at 104-05, 124 S.Ct. 2276. The Court also noted that cases applying the TIA generally “involved plaintiffs who mounted federal litigation to avoid paying state taxes (or to gain a refund of such taxes).” Id. at 106, 124 S.Ct. 2276. Plaintiffs in this case are of course not seeking to avoid paying for a “Choose Life” license plate, and it is therefore at least questionable whether the TIA would apply even if the payment for the license plates were a "tax.” We need not reach the issue, however, because of our determination that no tax is involved here.

. "In invitum” means "[ajgainst an unwilling person.” BLACK'S LAW DICTIONARY 787 (7th ed.1999).

. See Scott Catalogue No. 905 (1942). The example is hardly unusual, as United States postage stamps have carried a variety of government-crafted advocacy messages over the years. Examples include "Give Me Liberty or Give Me Death” (Scott No. 1144 (1961)), "Register and Vote” (Scott No. 1394 (1968)), "Giving Blood Saves Lives” (Scott No. 1425 (1971)), "Organ and Tissue Donation: Share Your Life...” (Scott No. 3227 (1998)), and "Breast Cancer, Fund the Fight, Find a Cure” (Scott No. B1 (1998)). See also Scott No. 1129 ("World Peace Through World Trade”), No. 1142 (“And this be our Motto, in God is our Trust”), No. 1320 ("We appreciate our Servicemen”), No. 1343 ("Law and Order”), No. 1438 ("Prevent Drug Abuse”), No. 1455 ("Family Planning”), No. 1802 ("Honoring Vietnam Veterans”), No. 1831 ("Organized Labor Proud and Free”), No. 1927 ("Alcoholism You Can Beat It!”), No. 2102 ("Take a Bite out of Crime”).

. See KY. REV. STAT. ANN. § 186.162(2)(y) (2005).