*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0343p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BELLSOUTH TELECOMMUNICATIONS, INC., et al.,
                              *Plaintiffs-Appellees,*


                    *v.*                                             Nos. 07-5397/5424

JOHN FARRIS, Secretary of the Finance and
Administration Cabinet, Commonwealth of
Kentucky, et al.,
                              *Defendants-Appellants.*

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
Nos. 06-00039; 06-00016—Karen K. Caldwell, District Judge.

Argued: March 12, 2008

Decided and Filed: September 9, 2008

Before: DAUGHTREY and SUTTON, Circuit Judges; POLSTER, District Judge.[*]

---

## COUNSEL

**ARGUED:** Laura M. Ferguson, FINANCE AND ADMINISTRATION CABINET, Frankfort, Kentucky, for Appellants. Geoffrey M. Klineberg, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, Washington, D.C., for Appellees. **ON BRIEF:** Laura M. Ferguson, Douglas M. Dowell, FINANCE AND ADMINISTRATION CABINET, Frankfort, Kentucky, for Appellants. Geoffrey M. Klineberg, Daniel G. Bird, Michael K. Kellogg, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, Washington, D.C., for Appellees. Helgi C. Walker, WILEY REIN, Washington, D.C., Douglas R. Cole, JONES DAY, Columbus, Ohio, Bruce V. Griffiths, OFFICE OF THE TEXAS ATTORNEY GENERAL, Austin, Texas, for Amici Curiae.

SUTTON, J., delivered the opinion of the court, in which POLSTER, D.J., joined. DAUGHTREY, J. (pp. 12-14), delivered a separate opinion concurring in part and dissenting in part.

---

[*] The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

---

**OPINION**

---

SUTTON, Circuit Judge.  In 2005, Kentucky imposed a 1.3% tax on the gross revenues of telecommunications providers.  Ky. Rev. Stat. Ann. § 136.616(1), (2)(b).  In connection with the new tax, the legislature banned providers from "collect[ing] the tax directly" from consumers and from "separately stat[ing] the tax on the bill."  *Id*. § 136.616(3).  The providers filed this lawsuit because they want to identify the new tax as a line item on all customer invoices to explain why they have raised prices, while the Commonwealth says that the new law prevents them from doing so.

No one disputes Kentucky's authority to impose this tax, the providers' responsibility to pay it or Kentucky's authority to prevent providers from switching the legal incidence of taxation to their customers.  And no one disputes the providers' right to raise prices to account for this additional cost of doing business.  The question is whether the Commonwealth may permit providers to raise prices but prohibit them from using their invoices to say why without running afoul of the "freedom of speech" protections of the First (and Fourteenth) Amendment.  Whether the no-stating-the-tax provision is more akin to a price-advertising ban (governed by the commercial-speech doctrine) or to a ban on protesting a new tax in the forum most likely to get consumers' attention (governed by the political-speech doctrine) need not detain us.  For it fails to satisfy even the intermediate scrutiny that applies to restrictions on commercial speech.  The district court having come to a similar conclusion, we affirm.  To the extent the district court also meant to invalidate the provision that bars providers from collecting the tax directly from the consumer, a point not entirely clear from the decision, we reverse that portion of its decision, as this provision regulates conduct, not speech.

I.

On March 18, 2005, Kentucky enacted a statute taxing "the gross revenues received by all [telecommunications] providers."  *Id.* § 136.616(1).  The statute makes providers responsible for a tax of "[o]ne and three-tenths percent (1.3%) of the gross revenues received for the provision of communications services . . . billed on or after January 1, 2006."  *Id*. § 136.616(2)(b).  The law also regulates the way providers may collect the tax and what they may say in doing so:  "The provider shall not collect the tax directly from the purchaser or separately state the tax on the bill to the purchaser."  *Id*. § 136.616(3).  A separate section of the Kentucky tax code penalizes those providers who violate the provision with a fine "of twenty-five dollars ($25) per purchaser offense, not to exceed ten thousand dollars ($10,000) per month."  *Id*. § 136.990(11).

BellSouth and AT&T filed separate lawsuits against the Kentucky officials responsible for administering the tax, each seeking a declaration that (1) § 136.616(3) and § 136.990(11) violate the First (and Fourteenth) Amendment of the United States Constitution, (2) the two laws violate the Commerce Clause of the United States Constitution and (3) the Federal Communications Act, 47 U.S.C. § 151 *et seq.*, preempts both laws.  In each case, the district court held that the Tax Injunction Act did not bar the lawsuit, granted the providers' motion for summary judgment on the First Amendment claim, denied their motion on the Commerce Clause claim and declined to reach the preemption claim.  Kentucky challenged the adverse rulings, and we consolidated the cases on appeal.

II.

Before reaching the merits of the First Amendment question, we must consider our jurisdiction to do so.  Under the Tax Injunction Act, federal courts may not "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and

efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The district court concluded that the Act did not bar this lawsuit. We agree—for several reasons.

*First*, the Act applies only when a claimant seeks to "enjoin" or otherwise hinder "the assessment, levy or collection" of a state tax. Yet there is nothing about this lawsuit that seeks to avoid paying taxes or to limit the amount of taxes due. In challenging § 136.616(3), the providers do not disclaim responsibility for paying the 1.3% gross-receipts tax. To the contrary: the tax appears in a separate part of the statute, *see* Ky. Rev. Stat. Ann. § 136.616(2), and the providers not only have declined to challenge that provision but also have accepted its validity for purposes of this case. If successful, this injunction thus will not hinder the Commonwealth's interest in collecting the tax.

*Second*, consistent with the language of the Act, the Supreme Court has construed it to apply "only in cases . . . in which state taxpayers seek federal-court orders enabling them *to avoid paying state taxes*." *Hibbs v. Winn*, 542 U.S. 88, 107 (2004) (emphasis added). And what the Court has said in construing the Act is consistent with what it has done: It has permitted lawsuits that do not seek to avoid paying taxes, and it has barred lawsuits that do. *Compare, e.g.*, *id.* at 112 (permitting suit challenging tax credits for donations to private-school scholarship funds), *and Jefferson County, Ala. v. Acker*, 527 U.S. 423, 435 (1999) (permitting suit *brought by a State* to collect taxes), *with Arkansas v. Farm Credit Servs. of Cent. Ark.*, 520 U.S. 821, 824 (1997) (barring suit that sought exemption from sales and income taxes), *California v. Grace Brethren Church*, 457 U.S. 393, 411 (1982) (barring suit that sought to prevent a State from collecting unemployment-compensation taxes), *and Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 512 (1981) (barring suit that sought to disclaim liability for property taxes). The district court's assumption of jurisdiction over this lawsuit fully respects these precedents.

*Third*, what the providers want is something that neither the language of the Act nor the Court's cases cover: to invalidate a law that prevents them from "collect[ing] the tax directly from the purchaser or separately stat[ing] the tax on the bill to the purchaser." Ky. Rev. Stat. Ann. § 136.616(3). That is not a request for a tax injunction; that is a request to end a ban on what the provider may say about the tax and on what the provider may do to collect the tax from someone else. If granted, this relief would not interfere with the relationship between the body that imposed the tax (the Commonwealth) and the bodies that owe the tax (the providers). It merely would allow the providers to identify the tax on the bill and allow them in the process to explain to their customers why they have raised prices. The Tax Injunction Act does not prevent such relief, relief that does not halt the collection or assessment of taxes but that merely facilitates what businesses have done for a long time—recover the costs of doing business (including paying new taxes) from customers for as long as the market will bear it.

*Fourth*, this application of the Act falls in line with several lower-court decisions, starting with our own. In *American Civil Liberties Union of Tennessee v. Bredesen*, 441 F.3d 370 (6th Cir. 2006), while we did not have occasion to issue a holding on the point, we hinted that today's interpretation was the right one. Plaintiffs challenged the validity of a Tennessee law that permitted them to choose certain license plate options but not others. "Plaintiffs in this case," we said, "are of course not seeking to avoid paying for a 'Choose Life' license plate, and it is therefore at least questionable whether the [Act] would apply even if the payment for the license plates were a 'tax.'" *Id.* at 373 n.1. And in other cases, we have recognized that the Act operates "particularly" to protect the States' "revenue raising" mechanisms, *Wright v. McClain*, 835 F.2d 143, 144 (6th Cir. 1987), and only to shield "taxes" defined in relevant part as "assessment[s] . . . for general revenue raising purposes," *Hedgepeth v. Tennessee*, 215 F.3d 608, 614 (6th Cir. 2000). All of this suggests that when a lawsuit does not directly threaten the "ultimate . . . public benefit" of raising tax revenue, *Am. Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Mgmt. Dist.*, 166 F.3d 835, 838 (6th Cir. 1999), as is true here, the Act does not apply.

In a case not unlike this one, the Second Circuit held that the Act did not apply to a challenge to a state law restricting a taxpayer's efforts to recover the costs of a new tax from its customers. "[T]he State," the court explained, "has the right to place the legal incidence of the tax upon the oil companies; it has selected its target. But in barring the targets of the tax from recovering their costs from the consumer directly or indirectly, the State has gone beyond its taxing powers and has employed its police powers. . . . We simply hold that the action is not insulated from federal scrutiny by the [Act]." *Mobil Oil Corp. v. Tully*, 639 F.2d 912, 918 (2d Cir. 1981). In a companion case challenging a similar state law, the court likewise permitted oil companies to challenge an anti-pass-through provision, which purported to prevent oil companies from raising prices to account for a new tax. *Mobil Oil Corp. v. Dubno*, 639 F.2d 919, 922 (2d Cir. 1981) ("[I]t cannot seriously be argued that the judgment of the court below has enjoined, suspended or restrained the assessment, levy or collection of the gross receipts tax."); *see also Luessenhop v. Clinton County, N.Y.*, 466 F.3d 259, 266 (2d Cir. 2006); *Wells v. Malloy*, 510 F.2d 74, 77 (2d Cir. 1975).

The Commonwealth counters with several arguments—all unconvincing. Observing that the Act prohibits injunctions against the "assessment, levy [and] *collection*" of taxes, 28 U.S.C. § 1341 (emphasis added), it points out that the providers seek to enjoin a provision that bans them from "*collect[ing]* the tax directly from the purchaser," Ky. Rev. Stat. Ann. § 136.616(3) (emphasis added). It is not that simple. A ban on enjoining *a State's* tax-collection efforts does not apply to a law that purports to restrict *a taxpayer's* efforts to collect those costs from others. "[A] phrase gathers meaning from the words around it," *Hibbs*, 542 U.S. at 101 (internal quotation marks and alterations omitted) and the words "assessment" and "levy" show that "collection" refers to a State's "assessment, levy [and] collection" of taxes, *see id.*, not a taxpayer's efforts to recover the costs of that tax from consumers, *see Tully*, 639 F.2d at 918; *Dubno*, 639 F.2d at 922.

Had the taxpayers sought to use their invoices to switch the legal incidence of taxation—saying to customers, "This is your legal responsibility, not ours"—that might be another matter. For that would seem to alter the Commonwealth's "assessment, levy, or collection" of taxes by altering the legal burden of taxation. Yet because this challenged provision neither generates tax revenue for the Commonwealth nor alters the relationship between the Commonwealth and the party obligated to pay the tax, the Act does not apply.

Neither does the Act apply whenever a taxpayer seeks to enjoin a law that happens to be *part* of a tax bill. "The mere fact that the anti-passthrough section is contained in a tax law of the State should not lead to automatic sanctuary under [the Act]." *Tully*, 639 F.2d at 918; *cf. Hibbs*, 542 U.S. at 104; *Jefferson County*, 527 U.S. at 435.

Without this provision, Kentucky adds, it will be unclear "that the legal incidence of the gross revenue tax rests upon the *provider* and not the customer." Br. at 17. But the providers do not deny responsibility for the tax, nor do they seek to avoid it. Even when § 136.616 is read without the challenged provision, the statute contains ample, indeed undeniable, evidence that the providers bear the legal burden of the tax. *See* Ky. Rev. Stat. Ann. § 136.616(1) ("A tax is hereby imposed on the *gross revenues received by all providers*.") (emphasis added); *id.* § 136.602(6) ("Gross revenues means all amounts *received* in money, credits, property, or other money's worth in any form, *by a provider* . . . .") (emphases added).

Nor may Kentucky evade federal jurisdiction on the ground that "[t]he relief sought . . . has the potential [of] reduc[ing] state revenues" by exposing the Commonwealth to litigation and to the administrative burden of processing (and rejecting) potential refund claims. Br. at 19. The Act does not strip federal courts of jurisdiction over all claims that might, after this or that happens, have *some* negative impact on local revenues; it strips jurisdiction over claims seeking to enjoin the collection of State "*tax*" revenue." *Wilbur v. Locke*, 423 F.3d 1101, 1110 (9th Cir. 2005); *see also Oklahoma ex rel. OK Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1111–12 (10th

Cir. 2006); *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County*, 115 F.3d 1372, 1383 (8th Cir. 1997).

Kentucky persists that, if the court invalidates § 136.616(3), that would render the penalty provision, § 136.990(11), ineffective. "Any provider who violates the provisions of KRS 136.616(3)," the penalty provision says, "shall be subject to a penalty of twenty-five dollars ($25) per purchaser offense, not to exceed ten thousand dollars ($10,000) per month." The elimination of this civil penalty provision might well decrease state revenue, but because it is not a "tax under State law," the Act does not apply. *See Bredesen*, 441 F.3d at 375; *see also RTC Commercial Assets Trust 1995-NP3-1 v. Phoenix Bond & Indem. Co.*, 169 F.3d 448, 457–58 (7th Cir. 1999). In the final analysis, the providers do not disclaim responsibility for the tax, and nothing about this lawsuit seeks relief from legal responsibility for the underlying tax, whether through an injunction or otherwise. The Tax Injunction Act does not apply.

III.

Next question: does the provision—either the no-stating-the-tax clause or the no-direct-collection clause—violate the First Amendment? Yes, we conclude, as to the first but not as to the second.

A.

While the no-stating-the-tax clause by its terms restricts speech, the question is what kind: Does it regulate commercial speech or other protected speech? Should we thus apply the four-part, commercial-speech test, *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980), or the more rigorous scrutiny that applies to content-based regulations of other types of protected speech, *see, e.g.*, *Boos v. Barry*, 485 U.S. 312, 321 (1988); *cf. R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 391 (1992)?

In one sense, the law looks like it regulates commercial speech, which the Court variously has defined as "expression related solely to the economic interests of the speaker and its audience," *Cent. Hudson*, 447 U.S. at 561, or as "speech proposing a commercial transaction," *id.* at 562. The Commonwealth does not wish to regulate the providers' speech about the new tax in any venue but one: a commercial invoice. And that venue suggests that the law concerns just "the economic interests" of the parties or just the means to describe a completed commercial transaction or to propose a new one. That the law primarily regulates "economic interests" also is suggested by our suspicion that the providers would not offer to provide a line item on an invoice if the Commonwealth *lowered or eliminated* this tax. The providers, like most businesses, are pursuing their economic interest in preserving their shareholders' return on their investment. And one honest, yet market-savvy, way to do that is to raise prices to offset the 1.3% tax while telling customers that the price increase will permit them to maintain, not expand, profits.

In another sense, the law looks like a ban on core political speech. Just because an "economic motivation" underlies speech, we know, does not "by itself" convert it into "commercial speech." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983). And what is going on here is more than just a debate about how best to sell toothpaste or, as here, telephone services. It is about announcing who bears political responsibility for a new tax and about doing so in the forum most likely to capture voters' attention: an invoice that displays a predictable consequence of the tax. At the same time that the law limits the providers' efforts to duck economic responsibility for a price increase, it permits legislators to duck political responsibility for the new tax. It takes little imagination to envision why an elected official would prefer to evade accountability for a tax increase—whether that official has taken a "Taxpayer Protection Pledge," as one of the amicus curiae alleges some Kentucky legislators have taken, or not. *See* Amicus Curiae Br. of CTIA—The

Wireless Association, at 28 & n.10. Either way, the no-stating-the-tax provision, passed at the same time as the underlying tax, facilitates keeping consumers (and voters) in the dark about the tax and its impact on their wallets.

Perhaps our difficulty in placing a label on the law suggests it is a hybrid, one that implicates commercial *and* political speech, that implicates the interests of consumers *and* voters and that draws its heritage as much from protests over the Townshend Acts as from the *Wealth of Nations*. If that is the case, we presumably would apply the more rigorous scrutiny. All laws, for example, must satisfy the Equal Protection Clause's ban on irrational line-drawing. Yet that does not mean rational-basis review governs a lawsuit challenging legislative lines drawn on racial or gender grounds. The more rigorous scrutiny would apply, just as one might say it ought to apply here. *Cf. R.A.V.*, 505 U.S. at 384; *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988).

While it may often be the case that a "'commonsense' distinction" will divide commercial speech from other speech, *Cent. Hudson*, 447 U.S. at 562, this is not one of those cases. It remains difficult to pin down where the political nature of these speech restrictions ends and the commercial nature of the restrictions begins. Yet because Kentucky's regulation does not survive even the less-stringent intermediate level of scrutiny applicable to commercial speech and because a choice between these categories thus would not affect the outcome of the case, we can save the issue for another day and decide only what we must to resolve this dispute. "[I]f it is not necessary to decide more, it is necessary not to decide more . . . ." *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment).

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976), broke with nearly 200 years of tradition when it decided that the "freedom of speech" guaranteed by the First Amendment applied to "commercial speech." *See United States v. Caputo*, 517 F.3d 935, 938 (7th Cir. 2008). Four years later, *Central Hudson* announced a four-part test to gauge the validity of commercial-speech regulations: (1) does the challenged law regulate speech, does the proposed speech concern lawful activity and is it non-misleading? (2) is the governmental interest substantial? (3) does the regulation directly advance the governmental interest? and (4) is the regulation more extensive than necessary to serve that interest? *See* 447 U.S. at 566. Gauged by this test, the law must fall.

*First*, this provision regulates speech, not conduct, as it prohibits providers from "stat[ing]" the tax on the bill. And as the positions of the parties illustrate, their debate concerns what the providers may say, not what they may do. The Commonwealth has no objection to the providers' conduct (raising prices to account for the new tax), just its speech (saying why it has raised prices).

In seeking to list the tax on consumer invoices, the providers' proposed speech also does not concern unlawful activity. If, as Kentucky has acknowledged, it does not oppose the providers' efforts to raise prices to account for the new tax, speech about the reasons for these price increases does not advance an illegal transaction. Nor does Kentucky law contain a general ban on line-item tax descriptions that the providers' invoices otherwise would violate. Indeed, the Commonwealth in some instances *requires* line item tax descriptions, even when (as here) the tax is imposed on the retailer. *See, e.g.*, Ky. Rev. Stat. Ann. §§ 139.200, .210 (requiring a "gross receipts" tax "imposed upon all retailers" to be "displayed separately from the sales price . . . on the sales receipt"). As for Kentucky's faint-hearted argument that the line item tax descriptions concern an unlawful activity because the line items would violate the speech ban, that contention simply chases the Commonwealth's tail. The lawfulness of the activity does not turn on the existence of the speech ban itself; otherwise, all commercial speech bans would all be constitutional.

Nor is the speech "inherently misleading" such that it receives *no* First Amendment protection. *In re R.M.J.*, 455 U.S. 191, 203 (1982). The proposed speech is truthful and verifiable:

The Commonwealth in fact imposed a 1.3% tax on the gross revenues of providers; the providers in fact increased prices to absorb the tax; and, so far as the record shows, the providers in fact intend to send invoices that will accurately show the amount by which the new tax increases prices.

Kentucky nowhere argues that the providers' speech is false. And truthfully telling customers why a company has raised prices simply by listing a new tax on a bill, it seems to us, is not the kind of false, inherently misleading speech that the First Amendment does not protect. Were it otherwise, we doubt that the United States Congress, the Federal Communications Commission or the Commonwealth would endorse line-item listings of taxes in one form or another. *See* 47 U.S.C. § 542(c)(3) ("Each cable operator may identify . . . as a separate line item on each regular bill of each subscriber, . . . [t]he amount of any other fee, tax, assessment, or charge of any kind imposed by any governmental authority on the transaction between the operator and the subscriber."); *In re Truth-in-Billing & Billing Format* (*Truth-in-Billing I*), 14 F.C.C.R. 7492, 7526 (1999) ("[W]e are concerned that precluding a breakdown of line item charges would facilitate carriers' ability to bury costs in lump figures."), *reconsideration granted in part on other grounds*, 15 F.C.C.R. 6023 (2000); *In re Truth-in-Billing and Billing Format* (*Truth-in-Billing II*), 20 F.C.C.R. 6448, 6471 (2005) (Separate line-item listings of taxes "will discourage a carrier from misleading consumers by recovering other operating costs as government mandated charges."), *vacated on other grounds by Nat'l Ass'n of State Util. Consumer Advocates v. FCC*, 457 F.3d 1238 (11th Cir. 2006), *modified on denial of reh'g*, 468 F.3d 1272 (11th Cir. 2006); Ky. Rev. Stat. Ann. §§ 139.200–210.

*Second*, while the Commonwealth has done little to justify this ban, we will accept solely for the sake of argument that Kentucky's interest in avoiding potential consumer confusion—here, that consumers, rather than the providers, bear legal responsibility for the 1.3% tax—is substantial.

*Third*, the regulation does not directly advance the government's interest in avoiding consumer confusion over responsibility for paying the tax. By considering whether the government's goals and the regulation's scope align or whether the regulation is riddled with "exemptions and inconsistencies," the directly advance prong seeks to ferret out whether a law ostensibly premised on legitimate public policy objectives in truth serves those objectives. *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 488–89 (1995); *see also Edenfield v. Fane*, 507 U.S. 761, 771 (1993) (noting that, without this requirement, the government "could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression"). One problem with the government's attempt to address consumer confusion is that the Commonwealth allows providers to tell their customers anything about the tax, no matter how confusing, in all settings save one: an invoice. A concern about consumer confusion, however, presumably would apply to all communications between the providers and consumers about the relationship between the tax and price increases—whether on the invoice, in advertisements or on billing inserts.

In *Coors*, the Court held that a regulation banning beer labels from displaying alcohol content violated the First Amendment for similar reasons, namely because the regulation banned information about alcohol content on beer labels but not in advertisements. 514 U.S. at 488. Just as "[t]he failure to prohibit the disclosure of alcohol content in advertising, which would seem to constitute a more influential weapon in any strength war than labels, ma[de] no rational sense if the Government's true aim [wa]s to suppress strength wars," *id.*, the failure to ban providers from distributing confusing information about the tax through flyers, separate mailings or advertisements, which would seem to be more confusing than a single separate line item, makes little sense if the Commonwealth truly aims to curb the distribution of confusing information to consumers, *see also Linmark Assocs., Inc. v. Twp. of Willingboro*, 431 U.S. 85, 94–96 (1977).

A similar problem flows from the Commonwealth's decision to prohibit just one type of line-item statement—those about this tax and no other. *Coors* again points the way. "While [the regulation] bans the disclosure of alcohol content on beer labels, it allows the exact opposite in the case of wines and spirits. . . . If combating strength wars were the goal, we would assume that Congress would regulate disclosure of alcohol content for the strongest beverages as well as for the weakest ones." *Coors*, 514 U.S. at 488. So it is the case here: while the statute bans providers from separately stating the tax on telecommunications bills, it *allows* those same separate statements on other industries' bills. *See, e.g.*, Ky. Rev. Stat. Ann. § 139.210 (requiring sales tax to be separately listed as a line item); *id.* § 139.380 (same for use tax); *cf. id.* § 143A.020 (natural gas); *id.* § 143.020 (coal processing). And some of these taxes, like the telecommunications tax, are likewise imposed on the retailer, not the purchaser. *See id.* §§ 139.210, 143A.020, 143.020. The Commonwealth offers no reason why telecommunications customers are any more likely to be confused by tax line items on bills than are consumers of, say, natural gas, and we cannot think of a good reason on our own. If the government's goal is to avoid consumer confusion, this law does not directly advance that interest.

*Fourth*, the Commonwealth fares no better under the "reasonable fit" prong. Just as the directly advance requirement generally guards against underinclusive laws (those that do too little), the reasonable-fit requirement generally guards against overinclusive laws (those that do too much). If that sounds like the government is playing on an uneven field, that is because it is: Before a government may resort to suppressing speech to address a policy problem, it must show that regulating conduct has not done the trick or that as a matter of common sense it could not do the trick. "If the First Amendment means anything, it means that regulating speech must be a last—not first—resort." *Thompson*, 535 U.S. at 373; *see also Pagan v. Frunchey*, 492 F.3d 766, 770–71 (6th Cir. 2007); *Jobe v. City of Catlettsburg*, 409 F.3d 261, 264 (6th Cir. 2005).

"Yet here it seems" that banning statements about the tax on the invoice was "the first strategy the Government thought to try." *Thompson*, 535 U.S. at 373. The government's interest in avoiding consumer confusion, as we have explained, arises from its fear that, if consumers see a line item on their invoices reflecting the new tax, they will jump to the conclusion that the Commonwealth has imposed the 1.3% tax directly on them, not on the providers. Even granting the Commonwealth's assumption that this was a potential problem, it retained a full arsenal of options short of restricting speech to address the issue.

For one, why not first enforce existing state law on the point? The Kentucky Consumer Protection Act already prohibits "[u]nfair, false, misleading, [and] deceptive acts or practices in the conduct of any trade or commerce." Ky. Rev. Stat. Ann. § 367.170. If Kentucky is right that the providers' invoices will mislead consumers, it has every right to use this law to stop the problem.

For another, why not rely on enforcement of federal regulations already on the books? One regulation focuses on the Commonwealth's precise interest: the risk of consumer confusion. It says that "[t]elephone bills shall be clearly organized," 47 C.F.R. § 64.2401(a), and that "[c]harges contained on telephone bills must be accompanied by a brief, clear, non-misleading, plain language" statement, *id.* § 64.2401(b). To the extent the Commonwealth worries that line items will confuse consumers, it remains unclear why the Commonwealth is unwilling to rely on the FCC's enforcement of the requirement that the line items be "clear," "non-misleading" and "plain." The FCC, indeed, has addressed this issue, concluding that "it is a misleading practice" for a communications provider to imply that a charge is imposed by the government, when, in fact, the company made a business decision "to recover [the cost] directly from consumers through a separate line item charge." *See Truth-in-Billing II*, 20 F.C.C.R. at 6461. At the same time, however, the FCC has not banned line items altogether, noting that (1) they convey "useful information to the consumer in better understanding the charges associated with their service," (2) they permit providers to let their customers know which costs originate with the carrier and which costs

originate with elected officials and (3) they prevent providers from lumping all costs (and price increases) together rather than identifying their constituent parts. *See id.* at 6459, 6471; *see Truth-in-Billing I*, 14 F.C.C.R. at 7526.

For still another, why not require a disclaimer about the gross revenues tax any time a provider chooses to mention the tax on a bill? In some settings where there is a meaningful risk of confusion, we have held that "[a] disclaimer . . . would adequately address a state's concern." *Parker v. Ky. Bd. of Dentistry*, 818 F.2d 504, 510 (6th Cir. 1987).

If the Commonwealth wants something stronger than its own state law, the existing federal regulations and the requirement of a disclaimer, why not add an award of costs and fees to litigants who successfully challenge a misleading line item? "The difficulty with [Kentucky's] argument is that the State can serve [its] interest through means that would not violate [the providers'] First Amendment rights, such as awarding costs and fees . . . [and] imposing on appellant the reasonable expenses of responsible groups that represent the public interest . . . ." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 19 (1986). After all, "if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993).

And if all of this still leaves the Commonwealth cold, why not ensure that its fear of consumer confusion is real before suppressing this type of speech? Keep in mind that the new law does not prohibit the providers from raising prices to account for the new tax, and no one claims that the providers wish to switch the legal incidence of taxation to consumers. While some consumers may still worry whether Kentucky has placed the incidence of taxation on them, despite the statute's clear indication to the contrary, the Commonwealth offers no evidence or studies to suggest that is so, and it is "hardly . . . obvious" as a matter of common sense. *Pagan*, 498 F.3d at 775; *cf. Jobe*, 409 F.3d at 264. In view of "the complete absence of any evidence of deception," *Ibanez v. Fla. Dept. of Bus. & Prof'l Regulation*, 512 U.S. 136, 145 (1994), and in view of the absence of any obvious source for the problem, the Commonwealth's "concern about the possibility of deception in hypothetical cases is not sufficient to rebut the constitutional presumption favoring disclosure over concealment," *id.* (internal quotation marks omitted).

It seems just as likely, moreover, that consumer curiosity will run in another direction: Why have prices been raised, and do the providers have authority to raise them? The providers' invoices of course seek to answer both questions. On this record, there is considerable reason to doubt whether the Commonwealth's speech ban corrects a problem of its own making or indeed was meant to respond to another problem—political accountability for the tax. Because the Commonwealth has not demonstrated that it "carefully calculated the costs and benefits associated with the burden on speech imposed by its prohibition," *Discovery Network*, 507 U.S. at 417 (internal quotation marks omitted), the provision amounts to precisely the kind of blunderbuss legislation that cannot satisfy the First Amendment's preference for resolving policy problems by regulating conduct rather than speech.

The Commonwealth responds that, because the statute "does nothing more than establish the legal incidence of the tax . . . and specify how and by whom it is to be collected and remitted," the *Central Hudson* framework should not apply in the first place. Br. at 21. If that were all the statute did, we would not be here. But the provision does more than that. It prevents providers from describing the tax in the one setting where the consumer is guaranteed to look: the invoice. Indeed, the breadth of the provision would seem to prevent a provider even from stating the tax on an invoice when the listing is designed to demonstrate not that it is raising prices but that it is keeping them constant, even as its competitors raise prices to account for the new tax. Even the Commonwealth's position in this case shows the communicative nature of the bill: A line item

cannot simultaneously be non-communicative, as Kentucky argues, and yet pose the risk of *communicating* a misleading message. *See* JA 124; *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001).

Nor does it make a difference that other channels of communication remain open to the providers. Because this is a content-based regulation of speech, the Court's softened restrictions for time, place and manner regulations do not apply. *See Discovery Network*, 507 U.S. at 428–30; *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n*, 447 U.S. 530, 541 n.10 (1980).

B.

That leaves the question whether the direct-collection clause, *see* Ky. Rev. Stat. Ann. § 136.616(3), violates the First Amendment and, if not, whether we may sever it from the no-stating-the-tax clause. It remains unclear, as an initial matter, precisely what the direct-collection clause does. The Commonwealth acknowledges that the clause does not prevent providers from raising prices to recover the costs of the new tax, and no one suggests that the providers intend to avoid paying the tax, whether this clause remains on the books or not. What purpose the clause still serves under these circumstances remains to be seen.

What does seem to be clear, however, is that the terms of the clause refer to non-expressive conduct, not speech, and as a result lie beyond the protection of the First Amendment. Because Kentucky encourages courts to sever invalid provisions from valid legislation "unless the remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the General Assembly would not have enacted the remaining parts without the unconstitutional part, or unless the remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the intent of the General Assembly," Ky. Rev. Stat. Ann. § 446.090, we sever the offending speech restriction from the rest of the statute, *cf. Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 330 (2006). Accordingly, to the extent the district court meant to strike all, rather than just part, of the provision, that was error.

Not so, say the providers. Because "[a]ny attempt to 'state' the tax on a customer's bill constitutes 'collect[ing] the tax directly' from the customer," we must throw out the conduct-related clause with the speech-related clause. Br. at 27. We grant that one way a provider could collect the tax directly from a customer is through a separate statement on the bill. But that does not mean that the separate-statement clause covers the same conduct as the direct-collection clause. Indeed, that the legislature elected to use both weighs against the providers' interpretation. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001). Just as one could directly collect the tax without separately stating it (to use the providers' example, "through direct, in-person communication," Br. at 27 (internal quotation marks omitted)), one could separately state the tax without collecting it directly (for example by listing the tax separately as an expense but rolling that expense into the overall rate). The two clauses, on this reading, may still bar two separate things: The first bars direct collection of the tax (regardless of how it is stated), and the second bars separately stating the tax (regardless of how it is collected). Regulating only conduct, the direct-collection prong is not unconstitutional on its face, which is to say in all or virtually all of its applications. *See Wash. State Grange v. Wash. State Republican Party*, 128 S. Ct. 1184, 1190 (2008).

That leaves one loose end—the validity of the penalty provision. *See* Ky. Rev. Stat. Ann. § 136.990(11). So long as the direct-collection prong may stay on the books, so may the penalty provision, to which it applies. Yet the penalty provision of course may not be applied to enforce the invalidated no-stating-the-tax provision.

IV.

For these reasons, we affirm in part and reverse in part and remand the case to the lower court for further proceedings.

---

### CONCURRING IN PART, DISSENTING IN PART

---

MARTHA CRAIG DAUGHTREY, Circuit Judge, concurring in part and dissenting in part. Section 136.616 of the Kentucky Revised Statutes imposes a 1.3% tax on the gross revenues of providers of communications services within the Commonwealth. *See* K.R.S. §§ 136.616(1) and (2). The validity of that tax is not at issue in this litigation. Subsection (3) of the legislation mandates, however, that "[t]he provider shall not collect the tax directly from the purchaser or separately state the tax on the bill to the purchaser." It is this prohibition on the communication of certain information that has engendered this legal dispute between BellSouth and the Kentucky officials charged with the administration of the statute.

The majority adroitly resolves many of the thorny subissues involved in this appeal, and I concur in much of that exposition. Specifically, I agree that this litigation is not circumscribed by the Tax Injunction Act, 28 U.S.C. § 1341. Furthermore, I concur in the conclusion of the majority that the provision of the Kentucky statute that bars the actual *collection* of the tax at issue from consumers regulates conduct, not speech, and thus withstands constitutional scrutiny. Because, however, I would conclude that the speech that is restricted by the statute is both commercial in nature and inherently misleading, I respectfully dissent from the majority's invalidation of the legislative directive that a regulated industry not include the gross receipts tax as a line item on customers' bills.

### *Commercial Nature of the Speech*

Although the United States Supreme Court has recognized a "commonsense" distinction between commercial speech "and other varieties of speech," *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of NY*, 447 U.S. 557, 562 (1980) (quoting *Ohralik v. OH State Bar Ass'n*, 436 U.S. 447, 455-56 (1978)), this case exemplifies the lack of clarity in such a distinction. Even in *Central Hudson*, the Court first equated commercial speech with "expression related solely to the economic interests of the speaker and its audience." *Id*. at 561. Immediately after that seemingly straightforward description, however, the Court continued by explaining that "[c]ommercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Id*. at 561-62. Thus, according to the Court's own words, commercial speech does *not* involve *solely* the economic interests of the speaker; certain societal benefits also spring from the sharing of ideas and information that necessarily accompanies any such communication.

Prior to its decision in *Central Hudson*, the Supreme Court embraced an even more restrictive view of commercial speech, equating it simply with "speech proposing a commercial transaction." *Ohralik*, 436 U.S. at 455-56; *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64 (1983). It is this line of cases upon which BellSouth now appears to rely, arguing that placement of the tax line-item on a consumer's bill cannot be considered commercial speech because the communication also serves the additional purpose of informing the consumer exactly who is responsible for the increase in costs passed on to the end-user.

I find BellSouth's argument in this regard unhelpful in light of *Central Hudson*'s refinement of the Court's earlier commercial speech analyses. Indeed, even in instances involving what is typically considered classic commercial speech, a potentially broader underlying concern could be uncovered such that the speech might otherwise merit the stricter protections now reserved for non-commercial communication. For example, a newspaper advertisement of a sale on gas-guzzling Hummers could be construed not as a strategy to sell motor vehicles, but as a political statement that the country need not concern itself with the two-headed monster of environmental degradation and

destructive self-aggrandizement. Likewise, a circular announcing drastic pre-fall price cuts on camouflage outerwear might not be seen as simply an effort to boost lagging clothing sales in a crippled economy, but rather as the outward expression of support for the sport of hunting or even a subtle method of demonstrating contempt for the role of government in the regulation of firearms.

Despite the political accouterments that might thus be attached to the plaintiff's proposed communications, at its core BellSouth's desire to include a line-item on its invoices indicating the existence of a required 1.3% tax on the corporation's gross receipts is simply a commercially-savvy gambit to deflect from itself ultimate responsibility for a price increase that could encourage consumers to seek telecommunications service from another company. The speech thus has a predominant commercial value, with any political or other protected aspect being not only speculative but tangential and *de minimis*. I thus conclude that the speech at issue in this case is commercial in nature and that any restrictions on it must satisfy only the less-stringent analytical test of *Central Hudson* set forth in the majority opinion.

### *Misleading Nature of the Speech*

As explained by the majority, the threshold inquiry under the *Central Hudson* analysis seeks simply to ensure that "the communication is neither misleading nor related to unlawful activity." *Cent. Hudson*, 447 U.S. at 564. Indeed, "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Id.* at 563. Consequently, "[t]he government may ban forms of communication more likely to deceive the public than to inform it." *Id.* (citing *Friedman v. Rogers*, 440 U.S. 1, 13, 15-16 (1979), and *Ohralik*, 436 U.S. at 464-65).

By including a line-item tax on a consumer's invoice, BellSouth clearly gives the impression that the consumer is responsible for the additional tax imposed by the government through legislation. In fact, however, K.R.S. § 136.616(3) explicitly provides that the gross revenue tax imposed by the legislation is *not* the responsibility of the consumer but, rather, must be handled by the telecommunications company as an additional cost of doing business within the Commonwealth. I find it difficult to imagine more misleading "speech" than a list of charges referencing a monthly fee and various taxes, when one of the listed taxes is not to be assessed against the customer at all but is more akin to the fixed costs of a corporate entity, like building rental charges, satellite purchases, or other business overhead costs.

Clearly, line-item charges on a customers bill are not inherently misleading; to the contrary, such itemizations most often serve to explain the various components of a consumer's cost or, traditionally, are assessed "on the transaction between the operator and the subscriber." *See, e.g.*, 47 U.S.C. § 542(c)(3). Nevertheless, to insinuate that a certain charge is somehow dependent upon the consumer's usage of a particular telecommunication service when it is, in fact, an assessment only upon the gross revenues of the company providing the service is nothing if not misleading. Were BellSouth willing to place line items on customers' invoices listing the consumers' shares of payments for executive salaries, golden parachutes, lobbying expenses, business travel, corporate parties, advertising, and every other component of the corporation's costs of doing business, the line item defining the portion of the bill necessary to recoup payment of a gross receipts tax would not appear as deceptive. Its failure to do so, however, merely highlights the misleading nature of emphasizing that single fixed business-operations expense.

By banning the inclusion of a line item on consumers' invoices listing that portion of each individual bill that represents a portion of a gross-receipts tax imposed upon BellSouth, the Kentucky legislature has acted to protect Commonwealth citizens from misleading, deceptive information. Because cherished First Amendment principles do not protect false or misleading

commercial speech, I dissent from the majority's analysis of this issue and would reverse the district court's invalidation of the challenged ban that seeks to prevent just such deception.