# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 7, 2012           Decided July 24, 2012

No. 11-1219

SPIRIT AIRLINES, INC., ET AL.,
PETITIONER

SOUTHWEST AIRLINES CO.,
INTERVENOR

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,
RESPONDENT

AMERICAN SOCIETY OF TRAVEL AGENTS, INC.,
INTERVENOR

———

Consolidated with 11-1222

———

On Petitions for Review of Final Rules
of the U.S. Department of Transportation

———

*David M. Kirstein* argued the cause for petitioners. With him on the brief was *Joanne W. Young*.

*M. Roy Goldberg* and *Robert W. Kneisley* were on the briefs for intervenor Southwest Airlines Co. in support of petitioners.

*Bert W. Rein* and *Roger H. Miksad* were on the brief for *amicus curiae* International Air Transport Association in support of petitioners and intervenor.

*Andrew B. Steinberg* and *Jeffrey S. DeVore* were on the brief for *amicus curiae* Air Transport Association of America, Inc. in support of petitioners. *Robert P. Silverberg* entered an appearance.

*Daniel Tenny*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Tony West*, Assistant Attorney General, *Michael S. Raab*, Attorney, *Paul M. Geier*, Assistant General Counsel for Litigation, U.S. Department of Transportation, *Timothy H. Goodman*, Senior Trial Attorney, and *Blane Workie*, Deputy Assistant General Counsel for Aviation Enforcement and Proceedings.

*Dale C. Andrews* was on the brief for *amicus curiae* Interactive Travel Services Association in support of respondent.

Before: HENDERSON and TATEL, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Opinion concurring in part and dissenting in part filed by *Senior Circuit Judge* RANDOLPH.

TATEL, *Circuit Judge*: Pursuant to its authority to regulate "unfair and deceptive" practices in the airline industry, the Department of Transportation issued a final rule entitled "Enhancing Airline Passenger Protections." 76 Fed. Reg. 23,110 (Apr. 25, 2011). Spirit Airlines and others challenge

three of the rule's provisions—the requirement that the most prominent figure displayed on print advertisements and websites be the total price, inclusive of taxes (as arbitrary and capricious and a violation of the First Amendment); the requirement that airlines allow consumers who purchase their tickets more than a week in advance the option of canceling their reservations without penalty for twenty-four hours following purchase (as arbitrary and capricious); and the prohibition against increasing the price of air transportation and baggage fees after consumers purchase their tickets (as procedurally defective and otherwise arbitrary and capricious). For the reasons set forth in this opinion, we deny the petitions for review.

## I.

Prior to 1978, the federal government regulated the fares airlines could charge and the routes they could fly, and had authority to take administrative action against certain deceptive trade practices. Federal Aviation Act of 1958, Pub. L. No. 85-726, §§ 403–404, 411, 1002, 72 Stat. 731, 758–60, 769, 788–91. That changed in 1978 when Congress passed the Airline Deregulation Act, Pub. L. No. 95-504, 92 Stat. 1705, which, among other things, eliminated the government's ability to set airfares on the theory that "maximum reliance on competitive market forces would best further efficiency, innovation, and low prices as well as variety and quality of air transportation services," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992) (alteration, omission, and internal quotation marks omitted). Notwithstanding these changes, the government, through the Department of Transportation (DOT), retained authority to prohibit "unfair or deceptive practice[s] . . . in air transportation or the sale of air transportation." 49 U.S.C. § 41712(a).

Pursuant to that authority, DOT issued a final rule entitled "Enhancing Airline Passenger Protections." *See* 76 Fed. Reg. 23,110. Three of its provisions are at issue in this case.

The first relates to the advertising of airfares. Since 1984, DOT has required that any advertised price for air transportation disclose the "entire price to be paid by the customer to the air carrier." 49 Fed. Reg. 49,440, 49,440 (Dec. 20, 1984) (codified as amended at 14 C.F.R § 399.84(a)). Prior to the rulemaking at issue here, DOT allowed airlines to advertise the pre-tax price of tickets provided that the advertisement clearly disclosed the amount of the tax. *See* 75 Fed. Reg. 32,318, 32,327 (June 8, 2010) (explaining DOT enforcement policy regarding the 1984 rule). For example, airlines could advertise a "$167 base fare + $39 taxes and fees" even though consumers would have to add these two numbers to arrive at the total, final price they would have to pay—$206. DOT reaffirmed this policy in 2006. *See* 71 Fed. Reg. 55,398, 55,401 (Sept. 22, 2006) (withdrawing Notice of Proposed Rulemaking and retaining status quo). But in the challenged rule, DOT, citing consumer confusion, revised its policy to require airlines to state the total, final price—$206. *See* 76 Fed. Reg. at 23,166 (amending 14 C.F.R § 399.84(a)). Under this so-called "Airfare Advertising Rule," airlines remain free to provide an itemized breakdown (displaying to the customer the amount of the base fare, taxes, and other charges), but they may not display such price components "prominently" or "in the same or larger size as the total price." *Id.* In subsequent guidance, DOT explained that airlines may not list price components "in a more prominent place on a webpage or in a print advertisement than the advertised total fare." Office of Aviation Enforcement & Proceedings, Dep't of Transp., Answers to Frequently Asked Questions 22 (Oct. 19, 2011),

*available at* http://airconsumer.ost.dot.gov/rules/EAPP_2_ FAQ_10-19-2011.pdf. In other words, to ensure that consumers will clearly understand what final price they will have to pay, the total cost must be the most prominent figure. DOT describes this as a change in "enforcement policy." *See* 75 Fed. Reg. at 32,327 (discussing the proposed change).

DOT issued the second challenged provision, the "Refund Rule," in the context of a broader effort to curb deception and unfairness in the airline industry. Relying on customer feedback and Office of Inspector General reports, 72 Fed. Reg. 65,233, 65,236 (Nov. 20, 2007), DOT found that many airlines failed either to provide consumers with clear customer service plans or to adhere to whatever plans they did provide. Accordingly, DOT ordered U.S. carriers to adopt customer service plans that address a list of topics, including whether the airline "[a]llow[s] reservations to be held without payment or cancelled without penalty for a defined amount of time." 74 Fed. Reg. 68,983, 69,003 (Dec. 30, 2009) (amending 14 C.F.R. § 259.5(b)(4)). But in a later rulemaking, the one at issue here, DOT found this insufficient and that further steps were necessary to "ensure that . . . plans are specific and enforceable." 75 Fed. Reg. at 32,323. It found that some airlines had adopted "vague[]" policies that made it "difficult for a consumer to know" what exactly to expect. *Id.* For example, Allegiant Air's plan told customers that they could "cancel their reservations up to 24 hours before the scheduled time of departure, but fail[ed] to mention that there are significant fees associated with cancellation." Letter from Susan Kurland, Assistant Sec'y for Aviation & Int'l Affairs, Dep't of Transp., to Joanne W. Young & David M. Kirstein, Counsel for Petitioners 6 (July 20, 2011) (denying stay of the rule and explaining DOT's findings). Responding to such shortcomings, DOT proposed "establishing minimum standards for the plans," which would "result in consumers

being better informed and protected," 75 Fed. Reg. at 32,323—the idea being that anything less than the guarantees contained in the rule constitutes an unfair practice or has an unacceptably high risk of deceiving customers. One such requirement, the Refund Rule, directs airlines to allow passengers to cancel reservations without penalty for twenty-four hours "if the reservation is made one week or more prior to a flight's departure." 76 Fed. Reg. at 23,165 (amending 14 C.F.R. § 259.5(b)(4)).

Finally, the "Post-Purchase Price Rule" prohibits airlines from "increas[ing] . . . the price of the seat," the "price for the carriage of passenger baggage," or the "applicable fuel surcharge, after the air transportation has been purchased by the consumer, except in the case of an increase in a government-imposed tax or fee." *Id.* at 23,167 (amending 14 C.F.R. § 399.88(a)). DOT has now advised us that "it will undertake another rulemaking process to assess the appropriateness of applying the rule to ancillary charges other than baggage charges that traditionally have been included in the price of air transportation" and that "[u]ntil the conclusion of that rulemaking, the agency will only enforce the rule as applied to charges the consumer has already paid, to any charges for carry-on baggage and first and second checked bags, and to mandatory charges like fuel surcharges." DOT Br. 9.

Spirit Airlines and Allegiant Air (collectively Spirit) claim that all three rules are arbitrary and capricious and that the Airfare Advertising Rule violates the First Amendment rights of airlines to engage in commercial and political speech. Intervening on behalf of petitioners, Southwest Airlines challenges only the Airfare Advertising Rule.

**II.**

Beginning with their challenge to the Airfare Advertising Rule, the airlines argue that there is nothing inherently deceptive about listing taxes separately and that DOT lacked substantial evidence for concluding that doing so is deceptive in practice. By the airlines' count, only six commenters suggested that existing airline displays were confusing or misleading, and just two of those pointed to the exclusion of taxes from base fares as the source of their confusion. The airlines also emphasize that in 2010 (the year of the rulemaking), there were only 77 complaints about advertising, as compared, for example, to 3,336 about flight-related problems. Spirit Br. 27 (citing Office of Aviation Enforcement & Proceedings, Dep't of Transp., Air Travel Consumer Report 42 (Feb. 2011)). Thus, they argue, DOT acted arbitrarily and capriciously when it relied on such scant evidence, particularly given (1) the general norm in the U.S. economy of listing prices exclusive of taxes, (2) DOT precedent rejecting consumer comments about feeling deceived as insufficient to demonstrate deception, and (3) the fact that in 2006, DOT reaffirmed its policy of allowing base-fare advertising (i.e., not requiring airlines to integrate taxes into their advertised fare), even though roughly 500 commenters urged it to depart from that policy, *see* 71 Fed. Reg. at 55,399, 55,401.

We are unpersuaded. For one thing, DOT left unaltered the rule's key language (though it did add language allowing airlines to state charges, fees, and taxes separately while prohibiting them from doing so "prominently" or "in the same or larger size as the total price," 14 C.F.R. § 399.84). Since 1984, DOT has required any advertised price for air transportation to state the "entire price to be paid by the customer to the air carrier." 49 Fed. Reg. at 49,440 (codified as amended at 14 C.F.R § 399.84(a)). Because neither Spirit

nor Southwest challenges the original rule, the only question before us is whether DOT acted arbitrarily and capriciously when it decided to enforce that rule by requiring that airlines actually add the taxes to the base fare and disclose the total price. In considering this question, "we give substantial deference to an agency's interpretation of its own regulations, according the agency's interpretation thereof controlling weight unless it be plainly erroneous or inconsistent with the regulation." *St. Luke's Hosp. v. Sebelius*, 611 F.3d 900, 904 (D.C. Cir. 2010) (internal quotation marks omitted). Not only have the airlines offered us no basis for questioning DOT's interpretation of its rule, but they give short shrift to the record as a whole. In addition to the comments mentioned by the airlines, DOT relied on the following evidence: (1) comments from the original 1984 rulemaking, (2) roughly 500 comments from the 2006 hearing explaining how consumers were being confused by advertisements that itemized price components rather than display a single, total price, and (3) feedback from its "Regulation Room," an online forum DOT employs to solicit comments. Spirit contests the relevance of the Regulation Room, claiming that DOT framed the issue to elicit comments helpful to its end. But we need not consider the Regulation Room comments because the other two categories of evidence sufficiently support the intuitive conclusion that customers are likely to be deceived by price quotes significantly lower than the actual cost of travel. *See Kornman v. SEC*, 592 F.3d 173, 184 (D.C. Cir. 2010) ("Substantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (internal quotation marks omitted)).

The airlines also challenge DOT's prohibition on disclosing government taxes and fees "prominently," arguing that "DOT provides no explanation [for] why the prominent disclosure of taxes and fees would be confusing to

consumers," and that DOT acted arbitrarily and capriciously by "requir[ing] airlines to prominently and conspicuously disclose airline-imposed fees but . . . bury[ing] in fine print the taxes and fees that the government itself imposes on air transportation." Southwest Br. 28–29. DOT responds that it "reasonably declined to allow the airlines to state, with equal prominence, the breakdown of that figure as between base fare, airline-imposed fees, and government taxes and fees." DOT Br. 27. In addition, it clarifies that its prohibition on prominently stating taxes " 'means that the break-out of per-person charges cannot be in a more prominent place on a web page or in a print advertisement than the total advertised fare.' " *Id.* at 28 (quoting Office of Aviation Enforcement & Proceedings, Dep't of Transp., Answers to Frequently Asked Questions 22).

DOT has the better argument. Contrary to the airlines' repeated suggestions, nothing in the Airfare Advertising Rule requires airlines to hide the taxes—or, as Spirit's website puts it, the "Government's Cut." It just requires that the total, final price be the most prominently listed figure, relying on the reasonable theory that this prevents airlines from confusing consumers about the total cost of their travel. This limited imposition hardly amounts to an arbitrary exercise of DOT's statutory authority to prevent "unfair or deceptive practice[s]," 49 U.S.C. § 41712(a). *See Petal Gas Storage, LLC v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007) (under the arbitrary and capricious standard of review, an agency "is not required to choose the best solution, only a reasonable one").

Next, the airlines contend that the Airfare Advertising Rule violates the First Amendment. The parties dispute which standard of review governs: strict scrutiny, applied to laws burdening political speech, *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 464 (2007); intermediate scrutiny, as defined in

*Central Hudson* and applied to laws regulating commercial speech, *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980); or reasonableness review, as defined in *Zauderer* and applied to laws requiring "purely factual" disclosures "reasonably related to the State's interest in preventing deception of consumers," *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985).

The airlines argue that strict scrutiny applies because they have "a First Amendment right to engage in political speech that informs [their] customer base of the huge tax burden that the federal government imposes on air travel." Southwest Br. 29; *see also* Spirit Br. 36–37. For support, they point to *Consolidated Edison Co. v. Public Service Commission of New York*, 447 U.S. 530 (1980), where the Supreme Court invalidated a rule prohibiting utilities from including pro-nuclear energy statements in their invoice envelopes. In doing so, the Court treated the ban as a restriction on political speech, meaning that it had to be "a precisely drawn means of serving a compelling state interest," *id.* at 540. According to the airlines, because they wish to inform their customers about the large and burdensome taxes imposed on airfare, the Airfare Advertising Rule must also be subject to strict scrutiny. We disagree.

The speech at issue here—the advertising of prices—is quintessentially commercial insofar as it seeks to "do[] no more than propose a commercial transaction," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (internal quotation marks omitted). According to the airlines, their speech does more than propose a transaction, as it also makes a political point. *See also* Dissenting Op. at 4 n.2. But where speech "cannot be characterized merely as proposals to engage in commercial

transactions," it is nonetheless commercial in certain circumstances, for instance when it is an "advertisement[]," "refer[s] to a specific product," and the speaker "has an economic motivation" for it. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983). "The combination of all these characteristics"—undoubtedly present in this case—suffices to classify the speech as "commercial speech" under *Bolger*. *See id.* at 67 (emphasis omitted). As the Court explained there, "advertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech." *Id.* at 68 (internal quotation marks omitted). "A company has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions. Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." *Id.* (footnote and citation omitted).

This leaves either the *Central Hudson* or *Zauderer* frameworks, and we think the latter applies. The *Central Hudson* cases have at least two features not fully present here. As the Court recently explained, where, as in this case, laws are "directed at *misleading* commercial speech," and where they "impose a disclosure requirement rather than an affirmative limitation on speech," *Zauderer*, not *Central Hudson*, applies, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S. Ct. 1324, 1339 (2010)—i.e., "an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651. In *Central Hudson* itself, an electric utility challenged the constitutionality of a state regulation banning promotional

advertising by the utility. 447 U.S. at 558. The Court explained that because "[t]he First Amendment's concern for commercial speech is based on the informational function of advertising, . . . there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it." *Id.* at 563. But "[i]f the communication is neither misleading nor related to unlawful activity"—as was the advertising the state had banned in that case—the government "must assert a substantial interest to be achieved by restrictions on commercial speech." *Id.* at 564. Likewise, in *In re R.M.J.*, 455 U.S. 191 (1982), the Court applied intermediate scrutiny to ethics rules that "prohibited attorneys from advertising their practice areas in terms other than those prescribed by the State Supreme Court and from announcing the courts in which they were admitted to practice." *Milavetz*, 130 S. Ct. at 1340 (citing *In re R.M.J.*, 455 U.S. at 197–98). As the Court held there, and as it has since explained, there was no reason—in common sense or in experience—to suggest the prohibited "advertisements were themselves likely to mislead consumers." *Id.* (citing *In re R.M.J.*, 455 U.S. at 205). In addition, the rule in *In re R.M.J.* completely *prohibited* a category of speech (advertising practice areas in non-prescribed terms).

By contrast, in *Zauderer* the Court faced a rule that, instead of prohibiting speech, simply required a clarifying disclosure. Specifically, the rule required attorneys advertising contingency-fee services "to disclose in their advertisements that a losing client might still be responsible for certain litigation fees and costs." *Id.* at 1339 (describing *Zauderer*, 471 U.S. 626). The Court concluded that "an attorney's constitutionally protected interest in *not* providing the required factual information is 'minimal.' " *Id.* (quoting

*Zauderer*, 471 U.S. at 651). In doing so, the Court demanded no evidence that the advertisements would be misleading because, as it explained, "the *possibility* of deception" in that case was "self-evident." *Zauderer*, 471 U.S. at 652–53 (emphasis added). And in *Milavetz*, the Court applied the *Zauderer* standard to uphold a law requiring debt relief agencies to " 'clearly and conspicuously disclose in any advertisement of bankruptcy assistance services . . . that the services or benefits are with respect to bankruptcy relief' " and to include the following, " 'or a substantially similar statement' ": " 'We are a debt relief agency. We help people file for bankruptcy relief under the Bankruptcy Code.' " *Milavetz*, 130 S. Ct. at 1330 (quoting 11 U.S.C. § 528(a)(3), (4)). Citing *Zauderer*, the Court explained that the government had no need to produce "evidence that [the] advertisements are misleading" because, based on experience and common sense, the "likelihood of deception" in that case was "hardly a speculative one." *Id.* at 1340 (internal quotation marks omitted).

As in the *Zauderer* cases and unlike in the *Central Hudson* cases, the Airfare Advertising Rule targets misleading speech and does not constitute what the case law defines as an affirmative limitation on speech. To begin with, the government, as in *Milavetz*, had no need to produce additional "evidence that [the] advertisements are misleading" because the "likelihood of deception" here is "hardly . . . speculative," *id.* (internal quotation marks omitted). Based on common sense and over three decades of experience and complaints, DOT concluded that it was deceitful and misleading when the most prominent price listed by an airline is anything other than the total, final price of air travel. Disclosure requirements, moreover, are not the kind of limitations that the Court refers to when invoking the *Central Hudson* standard of review. To be sure, the airlines claim that the rule

here imposes an affirmative limitation on speech because it requires them to post the total, final price in the most prominent manner, thus prohibiting them from posting other numbers as prominently or more prominently than the total, final price. But by mentioning affirmative limitations on speech, the Court was referring to rules that prohibit certain kinds of speech—like the one in *In re R.M.J.*, which flatly "prohibited attorneys from advertising their practice areas in terms other than those prescribed by the State Supreme Court and from announcing the courts in which they were admitted to practice." *Milavetz*, 130 S. Ct. at 1340 (citing *In re R.M.J.*, 455 U.S. at 197–98); *see also Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 360, 368 (2002) (applying intermediate scrutiny to a law prohibiting providers of "compounded drugs" from advertising or promoting particular drugs); *Central Hudson*, 447 U.S. 557 (intermediate scrutiny for a law prohibiting promotional advertising by electric utilities); *Virginia State Bd.*, 425 U.S. at 773 (rejecting state statute that "completely suppress[ed] the dissemination of concededly truthful information about entirely lawful activity"). By contrast, the Airfare Advertising Rule does not prohibit airlines from saying anything; it just requires them to disclose the total, final price and to make it the most prominent figure in their advertisements. Though limiting the manner in which airlines may advertise information, this neither prohibits nor significantly burdens airlines' ability to provide that information.

And indeed they do. For example, Spirit's website prominently displays "Our Price"—broken down into "Base Fare + Fuel"—and then adds, with a plus sign, "Government's Cut," which is displayed clearly and separately, and then finally provides, in slightly larger font, the "Total Price." *See* Appendix A (a screenshot of a sample flight advertised on Spirit's website). The website also

separately states, underlined and in bold, the "government tax rate" for each flight price quote, so that consumers know the tax burden in both absolute and relative terms. Moreover, a bright orange link (in the form of a question mark) appears next to each of those price components—i.e., "Base Fare," "Fuel," and "Government's Cut"—and if one clicks that link, the site provides a further breakdown of what makes up the cost of airfare. For example, the base fare on domestic flights generally includes the cost of "Flight," a "Passenger Usage Fee," and what Spirit labels a fee for the "Unintended Consequences of DOT Regulations." *See generally* Spirit, www.spirit.com (last search conducted on June 6, 2012); *see also* Oral Arg. Rec. 32:37–33:05 (government attorney acknowledging that Spirit's current website is compliant with the new enforcement policy). All of this demonstrates what the rule's text already tells us: the rule is aimed at providing accurate information, not restricting it. Nothing in the rule prohibits the airlines from separately alerting the public to the taxes imposed on air transportation, much as the utility in *Consolidated Edison*, 447 U.S. 530, advised its customers of its support for nuclear energy. The airlines can even call attention to taxes and fees in their advertisements; what they cannot do is call attention to them by making them more prominent than the total, final price the customer must pay.

Having determined that the *Zauderer* standard applies, we have no doubt that DOT's final rule, which requires the total, final price to be the most prominently listed figure, is " 'reasonably related to the [government's] interest in preventing deception of consumers.' " *Milavetz*, 130 S. Ct. at 1340 (quoting *Zauderer*, 471 U.S. at 651). The rule aims to prevent consumer confusion about the total price they have to pay, and it goes without saying that requiring the total price to be the most prominent number is reasonably related to that interest.

The dissent disagrees, arguing that the rule fails under the *Central Hudson* test. To reach that conclusion, the dissent says that the rule bans airlines "from displaying taxes and fees prominently." Dissenting Op. at 3 (internal quotation marks omitted). But DOT interprets the rule to mean only that the " 'break-out of per-person charges cannot be in a more prominent place on a web page or in a print advertisement than the total advertised fare,' " such as " 'at the top of the page, ahead of the total price,' " or with " 'special highlighting that sets it apart and makes it more prominent than the total price,' " DOT Br. 28–29 (quoting Office of Aviation Enforcement & Proceedings, Dep't of Transp., Answers to Frequently Asked Questions 22). We owe "substantial deference" to the government's interpretation of its own rule, "according [it] controlling weight unless it be plainly erroneous or inconsistent with the regulation," *see St. Luke's Hosp.*, 611 F.3d at 904 (internal quotation marks omitted). Confirming this interpretation, government counsel stated at oral argument that Spirit's website, which displays taxes and fees vividly, *see* Appendix A, is fully compliant with the rule. *See* Oral Arg. Rec. 32:37–33:05.

So interpreted, the rule satisfies even the *Central Hudson* test. That test requires that we ask three questions. First, is the asserted government interest substantial? *Central Hudson*, 447 U.S. at 566. This is easy. The Supreme Court has already held that "[f]or purposes of [the *Central Hudson*] test, there is no question that [the government's] interest in ensuring the accuracy of commercial information in the marketplace is substantial," *Edenfield v. Fane*, 507 U.S. 761, 769 (1993). The second and third inquiries are related: "whether the regulation directly advances the governmental interest asserted," *Central Hudson*, 447 U.S. at 566, and "whether the fit between the government's ends and the means chosen to accomplish those ends 'is not necessarily perfect, but

reasonable,' " *Pearson v. Shalala*, 164 F.3d 650, 656 (D.C. Cir. 1999) (quoting *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)). These too are easy. The government interest—ensuring the accuracy of commercial information in the marketplace—is clearly and directly advanced by a regulation requiring that the total, final price be the most prominent. Moreover, such a regulation appears reasonably tailored to accomplish that end. Unlike in other cases—where the government expressly prohibits certain kinds of speech on the premise that consumers need government to protect them from accurate information, *see Bates v. State Bar of Ariz.*, 433 U.S. 350, 375 (1977) ("[W]e view as dubious any justification that is based on the benefits of public ignorance."); *cf. 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (opinion of Stevens, J.) ("The First Amendment directs us to be especially skeptical of regulations [of truthful, nonmisleading information] that seek to keep people in the dark for what the government perceives to be their own good.")—the rule simply regulates the manner of disclosure. It imposes no burden on speech other than requiring airlines to disclose the total price consumers will have to pay. This the First Amendment plainly permits.

## III.

Next, we address Spirit's challenge to the Refund Rule, which allows consumers to cancel reservations without penalty for twenty-four hours provided that they made those reservations more than a week in advance of the flight. Spirit argues that the rule violates the Airline Deregulation Act, which prohibits regulation of fares. It also argues that "DOT did not make a finding or even discuss the possibility that charging a cancellation penalty is deceptive" or unfair. Spirit Br. 49–50. Finally, Spirit points out that cancellation penalties allow airlines to ensure that their planes are full. Without

cancellation penalties, consumers could book several seats to cover their contingencies, cancel, and get full refunds, leaving the airlines with insufficient time to rebook.

Again, we are unpersuaded. For one thing, the rule has nothing to do with airfares. Instead, it regulates cancellation policies on the basis of a finding that existing practices were deceptive and unfair—a regulation plainly allowed under 49 U.S.C. § 41712 so long as it "was reasonable and . . . supported by substantial evidence in the record," *Nat'l Ass'n of State Util. Consumer Advocates v. FCC*, 372 F.3d 454, 461 (D.C. Cir. 2004). It was. DOT's finding of deception and unfairness in the context of an ongoing effort to reduce unfairness in the industry rests on over a decade's worth of recorded experience. DOT found that airlines were routinely misleading consumers with vague customer service policies. One manifestation of that unfairness, DOT found, was that consumers were led to expect, based on widespread advertising and general practices, that they may cancel reservations without penalty for twenty-four hours only to have that expectation thwarted by airlines with vague policies that often departed from this practice. Viewing this as unfair and deceptive, DOT now requires airlines to meet a basic set of customer service guarantees—guarantees that it crafted after canvassing industry norms and gauging consumer expectations. Finally, DOT took account of Spirit's concern about ensuring that its planes are full: it amended the proposed rule to apply only if seats are purchased more than a week in advance, thus allowing airlines at least that much time to rebook.

In sum, Spirit gives us no reason to believe that the Refund Rule—developed as part of a systematic effort aimed at preventing unfair and deceptive practices—is arbitrary or capricious. *See Petal Gas Storage*, 496 F.3d at 703 (agencies

"[are] not required to choose the best solution, only a reasonable one").

## IV.

This brings us, finally, to the Price Rule, which prohibits airlines from increasing the price of air transportation after consumers purchase their tickets. Because of some dispute as to whether the rule applies to ancillary charges, such as in-flight refreshments, DOT has informed us that it "will undertake a new notice-and-comment procedure before enforcing the post-purchase price increase provision to any ancillary service other than the carriage of carry-on baggage and the first and second checked bag." DOT Br. 51. Taking DOT at its word, we agree that the only issue before us is whether DOT appropriately prohibited airlines from raising the price of airline tickets, carry-on luggage, or the first two checked bags after customers buy their tickets.

According to Spirit, the Price Rule is procedurally unlawful because the final rule was not "a logical outgrowth of its notice" of proposed rulemaking. *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079 (D.C. Cir. 2009) (internal quotation marks omitted). In the Notice of Proposed Rulemaking, DOT explained it was considering prohibiting airlines "from raising the price after the consumer completes the purchase." 75 Fed. Reg. at 32,330. Given this, Spirit tells us that it "reasonably believed the proposal would prohibit the collection of additional amounts for a ticket *after* the passenger purchased a ticket, or for an optional service such as a checked bag or seat selection *after* the passenger paid for the optional service." Spirit Br. 53. Until the final rule was promulgated, it had no idea "that DOT also intended to prohibit price increases for optional services, which a passenger can select *after* he buys a ticket, *before* the passenger purchases them." *Id.* at 53–54. Thus, DOT failed to

give adequate "notice of the scope and general thrust of the proposed rule." *Id.* at 56. (internal quotation marks omitted).

This argument is ridiculous. As the government points out, the proposed rule deemed it an unfair and deceptive practice for a "seller of scheduled air transportation . . . to increase the price of that air transportation to a consumer, *including but not limited to* increase in the price of the seat, *increase in the price for the carriage of passenger baggage*, or increase in an applicable fuel surcharge, *after* the air transportation has been purchased by the consumer." 75 Fed. Reg. at 32,341 (emphasis added). The final rule adopted the same operative language with the following amendments: (1) adding "except in the case of an increase in a government-imposed tax or fee," and (2) specifying that a "purchase is deemed to have occurred when the full amount agreed upon has been paid by the consumer." 76 Fed. Reg. at 23,167 (amending 14 C.F.R. § 399.88(a)).

Spirit next argues that the Refund Rule is arbitrary and capricious. According to Spirit, DOT based the rule on its concern that "some *air tour operators* (who were also subject to the notice requirements) . . . were burying consumer notices about the possibility of price increases in their conditions of carriage." Spirit Br. 57. But, Spirit argues, this has no relationship to raising the price of an *optional* service *before* a consumer purchases it—especially given that "under the status quo, airlines are prohibited from increasing prices without first giving consumers notice prices could go up." *Id.* at 58. In addition, Spirit points out, "a passenger can protect himself against future price increases by purchasing optional services at the same time as (or as soon as possible after) he purchases his ticket." *Id.* at 59. But DOT saw this as a classic bait and switch. It found that when consumers purchase airline tickets, they assume that the price they pay for extra

bags at the airport will be the price advertised when they bought their ticket. Thus, DOT concluded, increasing the price of these very commonly purchased and practically necessary services (like the ability to carry bags onto the flight) amounts to an unfair practice. Under the APA, we ask only whether DOT's conclusion "was reasonable and . . . supported by substantial evidence in the record." *Nat'l Ass'n of State Util. Consumer Advocates*, 372 F.3d at 461. It was.

## V.

For the foregoing reasons, the petitions for review are denied.

*So ordered.*

# 22

## APPENDIX A

**TUESDAY, JULY 10**

## Washington DC – Reagan National - Atlanta

| Depart▼ | Arrive | Stops | Type | Our Price Base Fare [?] + Fuel [?] | + Government's Cut [?] | = Total Price |
|---|---|---|---|---|---|---|
| 10:05 AM | 6:00 PM | 1 Stop | Standard | $124.90 FREE | $29.69 | ◉ $154.59 |
| 4:45 PM | 11:28 PM | 1 Stop | Standard | $124.90 FREE | $29.69 | ○ $154.59 |

*i* **Your government tax rate** for this selection is 24%.

**Washington DC**

TUESDAY, JULY 10

| Depart ▼ | Arrive | Stops | Type | Base Fare ✔ + Fuel ? | + | Government's Cut ? | = | Total Price |
|---|---|---|---|---|---|---|---|---|
| 10:05 AM | 6:00 PM | 1 Stop | Standard | $124.90 FREE | | $29.69 | | ⦿ $154.59 |
| 4:45 PM | 11:28 PM | 1 Stop | Standard | $124.90 FREE | | $29.69 | | ○ $154.59 |

Flight $106.05
Unintended Consequences of DOT Regulations $1.86
Passenger Usage Fee $16.99
**Base Fare Total** **$124.90**

**Your government tax rate** for this selection is 24%.

RANDOLPH, *Senior Circuit Judge*, concurring in part and dissenting in part: Speech about government, especially speech critical of government, is at the core of "the freedom of speech." The First Amendment thus protects speech complaining about taxes. One of the Department of Transportation's new rules restricts such speech. The new rule dictates how airlines and others selling air transportation may convey information criticizing the taxes and fees exacted from their customers. The government is thus attempting to restrict speech critical of the government. The majority opinion upholds the rule. I think the rule violates the First Amendment.

The Department's rule regulates airfare advertising. I join the majority in its decision sustaining the rule's requirement that such advertisements must state the total price of airfare. 14 C.F.R. § 399.84(a). My problem is with the following portion of the rule: "Although charges included within the single total price listed (e.g., government taxes) may be stated separately or through links or 'pop ups' on websites that display the total price, such charges may not be false or misleading, may not be displayed prominently, may not be presented in the same or larger size as the total price, and must provide cost information on a per passenger basis that accurately reflects the costs of the item covered by the charge." *Id.*

The rule does not define "not . . . prominently." In the past, the Department used "prominently" to describe text that was "clear" and "large enough to alert a reader to the [subject]." *Trans World Airlines, Inc.*, Dep't of Transp., Order 95-7-46 (July 28, 1995). The preamble to the advertising rule reflects that definition. It explains that sellers of air transportation may display taxes and government-imposed fees "on the same page" as an advertised fare if the taxes and fees appear "in fine print." The preamble goes on to say that taxes and fees must "be presented in significantly smaller type" than the total price. Enhancing Airline Passenger Protections, 76 Fed. Reg. 23,110, 23,143 (Apr. 25, 2011). A guidance document issued to explain

the regulation states: "'Prominent' under this rule means that the break-out of per-person charges cannot be in a more prominent place . . . than the advertised total fare." Office of Aviation Enforcement and Proceedings, Dep't of Transp., Answers to Frequently Asked Questions 22 (Oct. 19, 2011). The document adds that taxes and fees "cannot be at the top of the page, ahead of the total price. The total price should be in larger font. The [taxes] should not have special highlighting that sets [them] apart and makes [them] more prominent than the total price (e.g., bold font, underlined, or italicized)." *Id*.

The majority quibbles about how much smaller the typeface of taxes and fees must be in comparison to the typeface of the total price.[1] This is a classic red herring, an attempt to

---

[1] The majority accuses me of not accepting the government's interpretation of its rule because I state that the rule requires taxes and fees to be displayed in "fine print" or a "significantly smaller" font size than the total price. Maj. Op. at 15-16. "Fine print" and "significantly smaller" are not my words. They are the Transportation Department's interpretation of what its rule requires. *See* 76 Fed. Reg. at 23,143. The guidance document the majority invokes does not suggest otherwise; that document interprets only the word "prominently," retains the requirement that the total price be listed in "larger font," and says nothing about how much smaller taxes and fees must be in comparison. Office of Aviation Enforcement and Proceedings, Dep't of Transp., Answers to Frequently Asked Questions 22.

The majority strains to support its ruling by reaching outside the record, in violation of the Administrative Procedure Act. *See Camp v. Pitts*, 411 U.S. 138, 142-43 (1973). It examines Spirit's current website and proclaims that although taxes and fees are not displayed in fine print, Spirit is not violating the rule. Maj. Op. at 15-16. And how exactly does the majority know this? Because the Department of Justice attorney supposedly said so during oral

divert attention from what is really at stake here. No matter how hard the majority tries, it cannot disguise the fact that the government has forbidden airlines from displaying taxes and fees "prominently"; that it has made it illegal for airlines to put these government charges in the same or larger typeface than that of the total price; that the government has ordered airlines not to place government taxes and fees above the total price and not to show these items in bold or italics or with underlining.

The airlines say they are engaging in political speech rather than commercial speech when they inform customers, and potential customers, of the amount of the total airfare attributable to government taxes and fees. For this reason they believe they are entitled to the full protection of the First Amendment. Their speech about taxes and fees will be in advertisements, and the airlines, of course, have an economic incentive for educating the public about these charges: if discourse regarding these charges results in the government lessening the financial burden it imposes, airfares would become more affordable and people would fly more often. These circumstances – advertising and economic incentive – do not necessarily disqualify the airlines' speech from being treated as political speech. In one of the leading First Amendment cases, *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the Court held that an advertisement placed in a newspaper to raise money was political speech the First Amendment protected. *See also Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530 (1980).

---

argument. But the Justice Department attorney said no such thing. How could he? There is no indication that the attorney had ever seen Spirit's website (it was Judge Tatel who brought it up during Spirit's argument). And at no point did the attorney say anything about *how much smaller* the type size of taxes and fees must be in comparison to the total price, which is the subject the Transportation Department discussed in the passages I quoted.

The majority opinion nevertheless holds that anything the airlines say in their advertisements regarding taxes and fees falls within the category of commercial speech, and is therefore subject to less than full constitutional protection. Maj. Op. at 10-11. No Supreme Court decision has ever dealt with the sort of regulation we have here. That is, none of the commercial speech cases – including *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983),[2] on which the majority relies – involved the government's attempt to control and to muffle speakers who are critical of the government. As the Sixth Circuit wrote in an analogous situation, a law "looks like a ban on core political speech" if it restricts companies from "announcing who bears political responsibility for a new tax . . . in the forum most likely to capture voters' attention" – here, in an advertisement. *Bellsouth Telecomms., Inc. v. Farris*, 542 F.3d 499, 504-05 (6th Cir. 2008). Because the law in *Bellsouth* was unconstitutional even if it regulated commercial speech, the Sixth Circuit found it unnecessary decide how the speech in that case should be classified. *Id.* The same is true here, and I am therefore content to assume *arguendo* that we have before us a law restricting commercial speech.

For commercial speech the current test, despite criticism,[3] is still *Central Hudson Gas & Electric Corp. v.*

---

[2] *Bolger* defined commercial speech as "speech which does 'no more than propose a commercial transaction.'" 463 U.S. at 66 (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)). The airlines want to do more than "merely" propose that the customer purchase airfare: the airlines want to criticize the government by revealing prominently the full extent of the costs government imposes on their customers' air travel.

[3] *See, e.g.*, *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 377 (2002) (Thomas, J., concurring); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501-04 (1996) (opinion of Stevens, J., joined by

*Public Service Commission*, 447 U.S. 557 (1980): restrictions on commercial speech are permissible if the government demonstrates (1) that it has a substantial interest in the restriction; (2) the regulation directly advances that interest; and (3) the regulation is not more extensive than necessary. *Id*. at 566. False, deceptive, or misleading advertisements can be banned altogether. *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 142 (1994).

What then are the government's interests here? The government's brief offers two: the "interest in ensuring that consumers are accurately informed of the cost of air travel"; and the interest in preventing consumers from being "confuse[d] . . . as to the actual price" of airfare.

With respect to the first – ensuring accurate information – the Transportation Department in the rulemaking never mentioned this in connection with the taxes and fees restrictions. And for good reason. The accuracy of the amount of fees and taxes listed in an advertisement does not depend on font size, positioning, prominence, or anything else regulated by the advertising rule.[4] And of course there is no evidence – how could there be? – that smaller typeface for taxes and fees, or anything else the rule requires for these charges, leads to more accurate airline advertising.

---

Kennedy and Ginsburg, JJ.); *id*. at 517 (Scalia, J., concurring in part and concurring in judgment).

[4] The only evidence in the record indicates that consumers "feel" misled when the total price is not disclosed or is hidden in footnotes and hyperlinks. *See* 76 Fed. Reg. at 23,142-43; Enhancing Airline Passenger Protections, 75 Fed. Reg. 32,318, 32,327-28 (proposed June 8, 2010); Price Advertising, 71 Fed. Reg. 55,398, 55,401-02 (Sept. 22, 2006). But the part of the rule addressing this topic is not the subject of my dissent.

The second interest – preventing confusion – was the only justification mentioned in the rulemaking.[5] But neither the Department in its rulemaking nor the government in its brief explains why disclosure of taxes in the same or larger font size as the total price, or at the top of a page rather than at the bottom, or in bold typeface rather than regular typeface, would confuse anyone. And neither the Department in its rulemaking nor the government in its brief cites any sort of evidentiary support for such a notion. The majority's opinion cites nothing either. These omissions should have resulted in a holding that this aspect of the advertising rule is unconstitutional.[6]

---

[5] The entirety of the Transportation Department's explanation is the following *non sequitur*: Disclosure of taxes and fees "must accurately reflect the actual costs to the carrier of the service or matter covered, be displayed on a per passenger basis, and be displayed in a manner that otherwise does not deceive consumers. Consequently, the rule requires that any such listing not be displayed prominently and be presented in significantly smaller type than the listing of the total price to ensure that consumers are not confused about the total price they must pay." 76 Fed. Reg. at 23,143.

[6] A further consideration is worth mentioning. Airlines, like most businesses, market their products through a variety of mediums. The preamble identifies social networking websites like Facebook and Twitter as popular ways to sell and advertise airfares. 76 Fed. Reg. at 23,143. The Notice of Proposed Rulemaking points to the common practice of marketing via text message. 75 Fed. Reg. at 32,327. In addition to being popular means for advertising, Facebook, Twitter, and text messages have this additional characteristic in common: *only one font size currently is possible*. The user can input text and numbers, but can do nothing more with regard to style or size before his message is distributed.

This leaves airlines three options when advertising on many platforms: (1) disclose taxes and violate the regulation; (2) suppress

In commercial speech cases, the government's burden is to demonstrate that its speech restriction "directly" advances the interest it identifies. *Central Hudson*, 447 U.S. at 566. To this end, the Supreme Court has required an evidentiary showing that the regulation advances the government's interest to a material extent. *See, e.g.*, *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999); *44 Liquormart*, 517 U.S. at 505 (plurality); *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 486-90 (1995); *Ibanez*, 512 U.S. at 142-43; *Edenfield v. Fane*, 507 U.S. 761, 770 (1993); *cf. Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984).[7] Government "speculation" or "conjecture" will not suffice. *Ibanez*, 512 U.S. at 143 (quoting *Edenfield*, 507 U.S. at 770).

---

tax information and comply with the rule; or (3) cease marketing on the platform altogether. The government addressed this problem at oral argument by explaining that it was "not aware of the [mediums] where you only have a choice of one font, but if [airlines] have a particular problem with the rule as applied in some situation like that . . . they can make that point with the agency." Oral Arg. Rec. at 33:31-46. If I understand the point, the onus is on the airlines to justify same-size disclosures whenever fine print is not an option, and it is the agency's prerogative to exempt truthful disclosures from the rule's reach. This is completely backwards; supplication and administrative clemency have no place in the First Amendment. "If the First Amendment means anything, it means that regulating speech must be a last – not first – resort." *Thompson*, 535 U.S. at 373.

[7] In *Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S. Ct. 1324, 1340 (2010), a commercial speech case dealing with the constitutionality of a federal statute, the Court accepted as evidence material in the congressional record and stated that it was self-evident that the advertisements at issue were misleading. *Milavetz* has no bearing on the relevant portion of the tax and fee rule. The opinion dealt with the requirement of disclosure. *Id*. at 1339; Maj. Op. at 12-13. The issue I am addressing deals with suppression of speech.

Yet the government has presented not a shred of evidence to support its tax and fee rule, and it has offered no reasoning to explain why a significant number of consumers would be confused without the rule. The lack of evidence is particularly telling. It is not because the Transportation Department was without experience with a system in which taxes were stated in large type. For more than a quarter of a century before the current advertising rule, the Department required airlines not to bury the amount of taxes in fine print, but to state the amount of taxes "clearly" and prominently, in a typesize at least as large as "the price of the trip." *Request of the Air Transp. Ass'n of Am. for an Exemption*, Dep't of Transp., Order 85-12-68 (Dec. 24, 1985). Yet there is no history, no example, of anyone reading the airlines' advertisements and coming away with the belief that the taxes and fees amounted to the total price of the airfare. The idea that the new rule is now needed to prevent such confusion is, to put it mildly, absolutely absurd. Taxes and fees for air travel are steep, but – the record shows – they still make up only twenty percent of the total cost of a ticket. Given the fact that the total airfare and the total taxes and fees included therein would be labeled as such, only a fool would confuse or misunderstand the two, regardless of how prominently the taxes and fees were displayed in comparison to the total charge. People get bills all the time that breakout the components of the total amount due. (Many list the total amount due at the bottom of the page – not at the top as the Department's rule requires.) Maybe someone somewhere at some time would be confused. But one of the abiding principles of the commercial speech cases is that the government may not restrict speech on the basis that someone somewhere may misread a particular advertisement.[8]

---

[8] The Supreme Court has rejected the proposition "that the public is not sophisticated enough to realize the limitations of advertising, and that the public is better kept in ignorance than trusted with correct

9

I therefore dissent from the majority opinion to the extent that it upholds the rule prohibiting sellers of air transportation from prominently displaying government taxes and fees. I join the balance of the majority's opinion.

---

but incomplete information." *Bates v. State Bar of Ariz.*, 433 U.S. 350, 374-75 (1977).

Even if commercial speech "may be potentially misleading to some consumers, that potential does not satisfy the [government's] heavy burden of justifying a categorical prohibition against the dissemination of accurate factual information to the [wider] public." *Peel v. Attorney Registration & Disciplinary Comm'n*, 496 U.S. 91, 109 (1990).